**LOCAL 2179, UNITED STEELWORK-ERS OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 85–4841.**

United States Court of Appeals, Fifth Circuit.

July 29, 1987.

David M. Silberman, Washington, D.C., Carl Frankel, Pittsburgh, Pa., for petitioner.

Arthur B. Smith, Jr., Chicago, Ill., for intervenor-Inland Steel.

William Bernstein, Elliott Moore, Kenneth Hipp, N.L.R.B., Washington, D.C., Joseph G. Norton, New Orleans, La., for respondent.

Before RUBIN and GARWOOD, Circuit Judges, and SHAW *, District Judge.

GARWOOD, Circuit Judge:

This case of first impression poses the question of whether the National Labor Relations Board (the NLRB or the Board) erred in characterizing an employer's decision to close a manufacturing facility and to relocate production to a new facility in a different state as not being subject to mandatory bargaining under the National Labor Relations Act (the Act). 29 U.S.C. §§ 151–169.

Inland Steel Container Company closed its New Orleans steel container fabrication plant and opened a facility in Mississippi to produce the same line of goods. The Company made the decision to close the factory unilaterally and did not bargain with its employees about whether the plant should be closed. The Union representing the New Orleans employees filed an unfair la-

---

* District Judge of the Western District of Louisi- ana, sitting by designation.

bor practice charge against Inland Steel Container Company, claiming that the Act requires a covered employer to engage in collective bargaining before making a decision to relocate production.

The NLRB's administrative law judge (ALJ) determined that the employer's decision was not primarily motivated by and did not turn on labor-cost considerations, and recommended dismissing the complaint, which the NLRB then ordered. In so doing, the ALJ and the NLRB relied on an earlier NLRB ruling which concluded that an employer's major business conduct decision, such as a plant relocation, was not subject to mandatory collective bargaining unless the decision "turns upon labor costs." The central issue is whether this standard—the *Otis II* standard [1]—for deciding whether such managerial decisions are subject to predecision mandatory collective bargaining is sustainable under the Supreme Court's decision in *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981).

We determine that, as applied to cases of this kind, *Otis II* is a reasonably defensible interpretation of the Act and Supreme Court decisions construing the duty to bargain thereunder. Accordingly, we deny the Union's petition for review of the NLRB's order dismissing its unfair labor practice complaint.

## I.

At all times pertinent to this case, a subsidiary of Inland Steel Company (Inland Steel) was in the business of fabricating steel shipping containers such as pails and barrels. This division, Inland Steel Container Company (Inland Container), operated six container fabrication plants, one of which was located in central New Orleans in a building constructed in the 1920's or 1930's.[2] Inland Container employees at the New Orleans plant were represented on the national level by the United Steelworkers of America (the Union), with Local 2179 (the Local) constituting the plant's collective bargaining unit.

## A. The Steel Container Business and the New Orleans Plant

The ALJ's findings of fact, adequately grounded in substantial evidence, reflected the following.

Until the 1970's, the steel container market was relatively stable and was dominated by three major manufacturers, one of which was Inland Container. The New Orleans facility provided steel barrels for the southern United States, while Inland Container's Canton, Mississippi plant produced shipping pails for approximately the same area. Of Inland Container's four other plants, two—in Illinois and New Jersey—were consolidated operations, each making both barrels and pails.

During the 1970's, the shipping barrel and pail business became highly competitive. Thirty different companies operated more than a hundred factories. Substitute plastic products appeared on the market; reconditioned steel containers claimed an increasing market share; plant manufacturing capacities increased; and a business recession reduced demand. The net effect was an intense price war. Moreover, by the early 1980's, a combination of government regulations and customer preference led to a demand for double-lined barrels, those with two applications of lining material, and to heightened rejections of steel containers that were found unsatisfactory because of defects such as poor painting, rust, leakage, and other flaws.

---

**1.** *Otis Elevator Co.*, 269 N.L.R.B. 891 (1984) [hereafter *Otis II*]. *Otis II* overruled an earlier decision appearing at 255 N.L.R.B. 235 (1981) [hereafter *Otis I*]).

**2.** Inland Container first acquired the building in 1939; at that time, the building had apparently been in use for other purposes for as many as twenty years. Approximately one year after the unfair labor practice charge in this case was filed, Inland Steel sold the business of its container division to a Netherlands corporation and removed itself from the steel container fabrication market. By the time the matter reached this Court, ownership of the site of the New Orleans plant and land had transferred to a hospital, which had demolished the factory buildings and fenced the now vacant lot.

These changed market conditions were especially significant for the New Orleans plant. The production line there had been assembled and altered over the years on an ad hoc basis as customer requirements and technology changed. Newer steel container facilities incorporated numerous design changes which improved both productivity and the quality of finished products. The New Orleans factory was ill-suited to making double-lined containers because its production line had been designed to accommodate only single-lined barrels; a second layer of lining could be applied only by running the drums through the production line a second time, which increased operating costs. Much of the facility's equipment was obsolete or deteriorating. The plant occupied one entire city block, bounded on every side by public streets, floor space within the plant was "limited or cramped," and the lack of empty lot space made expansion to improve the production line impractical. Inland Container could have restructured the inefficient production line within the existing building only by shutting down the plant for four months to install new equipment, but even drastic and costly remodeling would not have resolved all the plant's problems.

The plant also had a shipping-and-receiving bottleneck, caused in part by the interior design of the plant and in part by the facility's urban location. Unloading raw steel from railroad boxcars and loading finished containers onto trains and trucks had to occur "in the same compressed shipping and receiving area." Traffic congestion on narrow city streets impeded efficient materials handling.

In addition, regular heavy rains and an inadequate city storm sewerage system combined to cause periodic flooding of the steel storage area of the facility. The city's high humidity was another cause of rust, a problem Inland Container attempted to combat by providing special steel. The ALJ stated that "the New Orleans plant is the only plant in the container division using the less efficient 'oiled-steel' rather than 'dry steel' to help protect against rust." Before oiled steel could be fabricated, however, the oil had to be removed chemically, a process that occasionally damaged the metal's exterior coating. If all the oil was not removed, as also occurred at times, problems arose in making lining or paint adhere to the steel.

By 1982, the plant was operating at a net loss. The New Orleans plant had the capacity to produce some 800,000 barrels a year but was often shut down because of weather or equipment failures. In the first eight and a half months of 1982, the ALJ found that more than 228,500 barrels manufactured in the plant, approximately forty percent of production, "were rejected because of poor quality." By the end of 1982, Inland Container decided to permanently close the New Orleans plant and to exercise an option to purchase property located adjacent to its existing pail plant in Canton, Mississippi. The New Orleans plant was finally closed in October 1983.

## B. Labor-Management Relations at the New Orleans Plant

The Union and the Local began representing Inland Container's New Orleans employees in the 1940's. Under a national collective bargaining agreement effective from October 1, 1980 to October 1, 1983, Inland Container was obligated to give written notification of its intention to close a plant before finally deciding to do so and at least ninety days before the proposed closure date. Although the employer was required to meet with employees to discuss a "proposed closure or partial closure" after announcing its intention to close a plant, the agreement stated that "[t]he final closure decision shall be the exclusive function of the Company."

The national bargaining agreement also provided that employees in certain of Inland Container's steel fabricating plants—identified in the agreement as "List III" plants—were to receive the same basic wage and benefit package as unionized employees working in Inland Steel's steel manufacturing plants, which were classi-

fied as "List I" facilities.[3] The Canton, Mississippi plant was apparently not a "List III" (nor a "List I") facility.

The ALJ noted that "it is undisputed" that Inland Container repeatedly attempted to have its container plants removed from List III coverage in order to obtain more competitive wage and benefit rates. During the autumn of 1981, a letter from Inland Container to Union officials expressed concern about Inland's competitive disadvantage caused by "high labor rates." Noting that wages at, *inter alia,* the New Orleans plant exceeded what competitors paid by as much as $3.00 to $4.00 per hour, Inland Container's letter warned that List III "plants cannot survive if they are not allowed to become more cost competitive." In January 1982, Company officials met with Union officials to propose wage and benefit reductions for employees at Inland Container plants in New Orleans, Chicago, and Cleveland. The proposal was accepted by the Cleveland Local, but rejected by the Chicago and New Orleans Locals.

In April 1982, the ALJ found, Union officials wrote Inland Container president Martin Detmer to inform him that they "were 'not prepared to meet relative to concessions on the existing contract,'" and Inland Container shortly after receiving this letter "commenced its search for a new location to relocate its New Orleans facility."

In June 1982, negotiations for a new national collective bargaining agreement began. Inland Container proposed that its List III plants should not be governed by List I facility wage and benefit standards. The proposal was accepted by the Union executive board in November 1982 subject to later ratification by the Union membership. The Union membership eventually rejected the proposal, but apparently not until after Inland Container had announced its intention to close the New Orleans plant.[4]

In September 1982, while the national agreement discussions continued, Inland Container signed an option contract "for the right of first refusal until December 31, 1982, to purchase the Canton property." In October, Inland Container president Detmer advanced a proposal at a meeting of the Company's board of directors. He suggested that Inland Container should "approach the Union for 'monumental wage relief'" at the New Orleans plant. The board rejected Detmer's proposal. And it directed him "to discuss the shutdown of the New Orleans plant and to investigate further the 'feasibility' of purchasing the property in Canton."

On November 2, 1982, Inland Container's general manager of industrial relations, Walter Reilly, informed New Orleans Union staff representative Michael Nassar that the Company intended to close the New Orleans plant. The Company gave the Union formal notice of "the Company's intention to close permanently its New Orleans plant operations.... Representatives of the Company are prepared to meet with your representatives to discuss the pro-

---

**3.** For several decades, major steel producers and the United Steelworkers of America have bargained on a national, coordinated scale, with manufacturers, including Inland Steel, represented by the Steel Industry Coordinating Committee. The "basic steel agreement" produced by these negotiations binds any employer subsidiary or division in which the Union is the bargaining representative. Inland Container's Chicago, Cleveland, and New Orleans plants were List III facilities because the Union was the bargaining representative at those plants. The record does not reflect whether Inland Container's other plants offered wage and benefit conditions comparable to those at its List III plants, but it does suggest that some of Inland Container's competitors had lower labor costs than those at List III plants. A steel container fabricator would not be affected by the "basic steel agreement" if it were not a subsidiary of a

major steel producer or if its employees were either nonunion or were represented by a different union.

**4.** The record does not disclose the precise date of the Union's refusal to ratify the proposal. We note, however, that Inland Container gave formal notice of the plant closure on November 2 or 3, 1982, at a time when Inland Container may have known that the Union executive board was amenable to removing List III plants from the scope of the national agreement but would not have known of the proposal's eventual rejection. The chronology of these events suggests that the decision to close the plant did not hinge on whether wages and benefits at the New Orleans facility would be governed by the national agreement in the future.

posed closure...." A notice posted for employees stated that "we are going to permanently close the New Orleans plant." Reasons offered for the closure in these written notices included the factory's low volume of production, high operating costs, and plant and facility limitations.

Several union-management meetings took place in November and December 1982, after the formal notice of closure had been given. As the ALJ noted, the accounts of various witnesses about what was said on those occasions "differ in substantial respects." Representatives of Inland Container's management insist that their statements about the reasons for the plant closure remained consistent: the building's age and need for repairs, its limited size, rust and flooding, and other problems not related to labor costs. Union participants agreed that Inland Container officials described these problems but, in contrast, testified that the management representatives also said closure was motivated by the higher labor costs of the New Orleans plant as compared to the costs competitive steel container operations faced. Management witnesses claimed that they revealed Inland Container's intention to relocate the work of the plant, but Union witnesses stated that Inland Container only indicated it planned to remain in the southern market.

Both sides agreed, however, that the Union advanced the idea of concessions bargaining and that Inland Container's response was that it "would not make a proposal but would listen to what [the Union] had to offer on the subject." After a meeting on December 7, 1982, Inland Container's manager of industrial relations Walter Reilly wrote the Union representatives: "[I]t is essential that you let me know whether or not you intend to make a proposal [with respect to continuing operations at the New Orleans plant] by Monday, December 13, 1982 and if you are making a proposal that I have it by Friday, December 17, 1982." The Union did not respond and, by letter dated December 17, Inland Container notified the Union that the Company had made its "final decision" to close the New Orleans facility. Three

days later, Inland Container exercised its option to purchase an existing building in Canton, Mississippi, only slightly larger than the New Orleans plant but located on 9.5 acres of land and only some 150 yards from Inland Container's existing pail plant.

Two weeks after Inland Container exercised its option, the Union responded to the December 7 letter with a letter dated January 3, 1983. Expressing the Union's willingness "to discuss the terms and conditions to assure continued operations of the New Orleans plant or [to discuss] its shutdown," the letter did not advance any proposal to rescue the plant or offer any labor concessions. Instead, the letter stated "the Company alone knows what is needed to assure the continued operations of its plant in New Orleans. Therefore, it is only reasonable to understand that any proposals ... must come from the Company."

Inland Container indicated it was willing to discuss only the effects of the plant shutdown and wrote that Company officials would meet with Union representatives on January 27, 1983, "for the purpose of beginning discussions of a shutdown agreement." Before that meeting took place, on January 15, Inland Container's manager of industrial relations Walter Reilly received a call from a Union representative asking whether wage concessions would save the plant and whether Inland Container would be interested in a Union proposal. Reilly's uncontroverted testimony was that he responded negatively and discouraged any Union proposal for saving the plant.

The ALJ concluded that Inland Container first advised Union representatives of the Company's decision to relocate to Canton at the subsequent meeting, which occurred on January 28. From this point forward, discussions between labor and management focused on the effects of the plant shutdown.

## C. The Union's Unfair Labor Practice Complaint

On May 17, 1983, the Union filed an unfair labor practice charge under the Act. The charge alleged, *inter alia*, that Inland

Container had "announced its intent to relocate bargaining unit work ... to reduce its labor costs." After investigating the charge, the NLRB General Counsel filed a complaint against Inland Container on the grounds that the Company had decided to relocate without first engaging in bargaining about the decision with the Union, that bargaining before deciding to relocate the work of a bargaining unit was mandatory, and that the relocation was primarily motivated by Inland Container's desire to avoid the contractual labor costs associated with its New Orleans Union employees.[5]

In his January 14, 1985, decision, the ALJ found that Inland Container had not engaged in "decision" bargaining relative to the relocation, but had engaged in bargaining about the effects of the shutdown; that *Otis II* had held a decision to relocate based on general economic motives (and not turning on labor costs or arising from antiunion animus) was subject to permissive rather than mandatory bargaining; and that although labor costs were an important factor in Inland Container's decision, they were not predominant and the decision was primarily motivated by "a need to replace an inadequate facility" and "did not turn upon labor costs." The ALJ accordingly determined that the decision was not subject to mandatory bargaining and recommended that the Union's complaint be dismissed. As an alternative ground, the ALJ held that the Union had waived its right to complain.

All three members of the NLRB panel reviewing the ALJ's recommended order voted to adopt it, with two members affirming, without discussion, his rulings, findings, and conclusion that mandatory bargaining was not required, and the third member affirming only on waiver grounds and not reaching the primary ground.[6] The Union petitioned for review of this NLRB decision, and Inland Container intervened.

There is no contention—by the Union, the NLRB, or Inland Container—that the ALJ's fact-findings are not supported by substantial evidence on the record as a whole, and no party complains of any factual determination. Instead, the sole issue presented is the validity of the NLRB's *Otis II* standard for determining whether a management plant relocation decision such as that involved here is subject to mandatory bargaining. The *Otis II* inquiry regards a major management business conduct decision as subject to mandatory bargaining only if the decision "turns upon labor costs," and the Union contends that this test does not comport with the standard prescribed by the Supreme Court.

## II.

The Act requires covered labor organizations, section 8(b)(3), 29 U.S.C. § 158(b)(3), and employers, section 8(a)(5), 29 U.S.C. § 158(a)(5), to bargain collectively about "wages, hours, and other terms and conditions of employment." Section 8(d), 29 U.S.C. § 158(d).[7]

 Subjects within the "terms and conditions of employment" category are

5. The Union originally alleged that Inland Container had violated the Act's section 8(a)(1), 29 U.S.C. § 158(a)(1) (interference with employees' exercise of rights to organize, join, or assist a bargaining unit); section 8(a)(3), 29 U.S.C. § 158(a)(3) (discriminatory hiring for the new plant discouraging union membership); section 8(a)(5), 29 U.S.C. § 158(a)(5) (defining as an unfair labor practice an employer's refusal to bargain collectively about matters within section 9(a), 29 U.S.C. § 159(a), "rates of pay, wages, hours of employment, or other conditions of employment"); and section 8(d), 29 U.S.C. § 158(d) (defining collective bargaining duty). Only the section 8(a)(5) complaint against Inland Container is presented in this petition for review.

6. The Board majority did not reach the waiver issue.

7. Whether an employer has violated section 8(a)(5)—which requires an employer "to bargain collectively"—depends in turn on section 8(d), which defines collective bargaining as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." Cases construing the reach of section 8(a)(5) customarily refer to section 8(d) as a definitional section. *E.g., Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 402, 13 L.Ed.2d 233 (1964).

mandatory bargaining matters, and the decision to classify a subject as such is significant: the refusal of an employer or union to meet and discuss such subjects is a specific unfair labor practice; either party can be ordered to bargain to impasse about such subjects; and a union or employer is entitled to employ economic weapons to further its views on a mandatory bargaining subject. *See First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 2578–80, 2580 & n. 16, 69 L.Ed.2d 318 (1981). Matters outside of the "terms and conditions" category are permissive bargaining subjects, and an employer may elect not to discuss such subjects with an employee collective bargaining unit. *First National Maintenance, supra*, 101 S.Ct. at 2579 n. 13.

■ The reach of "terms and conditions of employment" is not unambiguous. Congress did not define management decisions to close a plant, to relocate work, or to terminate all business operations as either mandatory or permissive bargaining subjects. As the Supreme Court has said:

> "Congress deliberately left the words 'wages, hours, and other terms and conditions of employment' without further definition, for it did not intend to deprive the Board of the power further to define those terms in light of specific industrial practices." *First National Maintenance, supra*, 101 S.Ct. at 2579 (footnote omitted).[8]

The task of defining whether a particular matter is subject to mandatory or permissive bargaining belongs, at the outset, to the NLRB. As the Supreme Court has explained, "Construing and applying the duty to bargain and the language of § 8(d), 'other terms and conditions of employment,' are tasks lying at the heart of the Board's function." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979).

> "Because it is evident that Congress assigned to the Board the primary task of construing these provisions in the course of adjudicating charges of unfair refusals to bargain and because the 'classification of bargaining subjects as "terms or conditions of employment" is a matter concerning which the Board has special expertise,' ... its judgment as to what is a mandatory bargaining subject is entitled to considerable deference.

> "... Under these provisions [of the 1935 National Labor Relations Act], the Board was left with the task of identifying on a case-by-case basis those 'other conditions of employment' over which management was required to bargain." 99 S.Ct. at 1848 (citations omitted).

The *Ford Motor Co.* opinion further noted that Congress, in amending the Act in 1947, refused to enact draft legislation which "contained a specific listing of the issues subject to mandatory bargaining," and, instead, "made a conscious decision to continue its delegation to the Board of the primary responsibility of marking out the scope of the statutory language and of the statutory duty to bargain." *Id.* at 1848–49.

The standard for judicial review in cases of this kind, the Court wrote, should be that, "if [the Board's] construction of the statute is *reasonably defensible*, it should not be rejected merely because the courts might prefer another view of the statute." *Id.* at 1849 (emphasis added). Although *Ford Motor Co.* describes certain classes of exceptional situations in which an appellate court should not uphold the Board's construction of the Act,[9] the decision instructs

---

8. Section 8(d) was added to the Act in 1947. *Id.* 101 S.Ct. at 2578 n. 12. The Court also quoted with approval, *id.* at 2579 n. 14, H. Rep. No. 245, 80th Cong., 1st Sess. 71 (1947):

> "'What are proper subject matters for collective bargaining should be left in the first instance to employers and trade-unions, and in the second place, to any administrative agency skilled in the field and competent to devote the necessary time to a study of industrial practices and traditions in each industry or area of the country, subject to review by the courts. It cannot and should not be straitjacketed by legislative enactment.'"

9. *Ford Motor Co.* states that a Board order should be denied enforcement if the order has "'no reasonable basis in law,' either because the proper legal standard was not applied or because the Board applied the correct standard but failed to give the plain language of the standard its ordinary meaning"; if "the Board's interpretation ... [is] 'fundamentally inconsistent with the structure of the Act' and an attempt

that drawing the line between mandatory and permissive bargaining is entrusted first to the Board, and that Board determinations should be normally regarded with considerable deference and upheld so long as they are "reasonably defensible." It is this standard which we apply to this case.[10]

### III.

Two years after *Ford Motor Co. v. NLRB*, 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979), the Supreme Court addressed an employer's obligation to bargain before making a decision that alters the "scope and conduct of the business" and, simultaneously, significantly affects employees. In *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), the Supreme Court ruled that a particular management decision of this type—a partial business closing for purely economic reasons—was not subject to mandatory bargaining. The

extent to which *First National Maintenance* controls this case is central to the instant controversy, and the reach of *First National Maintenance* is in part defined by its relationship to predecessor decisions.

### A. Employer Decisions Falling Between Fibreboard and Darlington

Two Supreme Court decisions from 1964 and 1965 indicated the broad outlines of the limits of mandatory bargaining. The first, *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), involved the Court's determination that an employer not otherwise changing the scope or operation of its business was obligated to bargain before it could terminate a group of employees and engage an outside contractor to perform the same internal maintenance work if the employer's decision was motivated by the purpose of reducing labor costs.[11]

to usurp 'major policy decisions properly made by Congress' "; or if "the Board [is] moving 'into a new area of regulation which Congress ha[s] not committed to it' "; or if it makes "an unreasonable or unprincipled construction of the statute." *Id.* at 1849 (citations omitted); *see also Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 390–91, 30 L.Ed.2d 341 (1971) (noting policy of deferential review but refusing enforcement when "the Board's decision is not supported by the law"); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 83 S.Ct. 1139, 1149–50, 10 L.Ed.2d 308 (1963).

**10.** Although we do not decide the question, *Ford Motor Co.* may be read as indicating that deferential review also will not extend to Board holdings which would "permit the Union to usurp managerial decision making" or " 'managerial decisions ... at the core of entrepreneurial control.' " *Id.* 99 S.Ct. at 1850. We are not faced with such a Board decision here, and so no possible deferential review exception on that basis is appropriate to this case. In this connection, it is to be noted in *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), in sustaining the Board's determination that mandatory bargaining was required respecting an employer's decision to discontinue using employees for its factory maintenance and to instead have that function performed by an independent contractor, the Court did not mention the deferential standard of review. Subsequently, in *Textile Workers Union of America v. Darlington Mfg. Co.*, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), the Court in substance rejected a Board determination that the employer was required to bargain

over a decision to go out of business, but the standard of review was not addressed in this context. Nor was the deferential standard of review applied in *First National Maintenance* where the Court rejected the Board's determination that the employer was required to bargain over a decision to shut down part of its business for economic reasons. In *Fibreboard, Darlington,* and *First National Maintenance,* deferential review may or may not have been applied. But here, unlike the situation in each of those cases, the Board acted to sustain the employer's right to make decisions asserted to be at the core of entrepreneurial control.

In sum, we find no basis to depart from the usual standard of review in this proceeding.

**11.** The facts of *Fibreboard* may illustrate the contours of the Court's holding: The Fibreboard Paper Products Corporation owned and operated a manufacturing plant and relied upon a group of its employees to perform maintenance of its plant. Four days before the union contract covering the maintenance employees expired, Fibreboard "informed the Union that it had determined that substantial savings could be effected by contracting out the [maintenance] work" and that the contract would not be renewed. 85 S.Ct. at 400. Fibreboard's decision apparently turned on the conclusion "that economies could ᵦbe derived by reducing the work force, decreasing fringe benefits, and eliminating overtime payments." *Id.* at 404. The Court held that "the type of 'contracting out' involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the

A lasting influence of *Fibreboard* arose from Justice Stewart's concurring opinion classifying management decisions into three categories. 85 S.Ct. at 409–10. First, certain matters indisputably and necessarily involve "conditions of employment"—relief periods, working hours, the amount of work expected during those hours, safety practices, seniority rights, and rules governing subjects such as a compulsory retirement age or discriminatory firings. A second class of management decisions may "affect the job security of employees," but in a manner so "extremely indirect and uncertain" that the "decisions are not 'with respect to * * * conditions of employment.'" Included in this second class are decisions such as "the volume and kind of advertising expenditures, product design, [or] the manner of financing, and sales." Finally, the third class covers employer decisions that "may quite clearly imperil job security, or indeed terminate employment entirely" but that also concern "the commitment of investment capital and the basic scope of the enterprise." Justice Stewart urged that "managerial decisions[ ] which lie at the core of entrepreneurial control," "are fundamental to the basic direction of a corporate enterprise[,] or which impinge only indirectly upon employment security should be excluded" from mandatory bargaining. Examples of "class three" decisions offered by Justice Stewart included a company's decision to "invest in labor-saving machinery" or to "liquidate its assets and go out of business." In *First National Maintenance,* the Court adopted Justice Stewart's use of three classifications for employer business decisions, 101 S.Ct. at 2580, although it did not adopt a *per se* rule excluding all class three decisions from mandatory bargaining.

Another influence of *Fibreboard,* also from Justice Stewart's concurrence, was the concept that, because section 8(d) of the Act expresses a "statutory purpose of delineating a limited category of issues which are subject to the duty to bargain collectively," 85 S.Ct. at 408–09, "managerial decisions[ ] which lie at the core of entrepreneurial control" are not within that "limited category" and are therefore not subject to mandatory bargaining, *id.* at 409–10. These views of Justice Stewart have since been adopted, to some limited degree, by a majority of the Supreme Court.[12]

Soon after *Fibreboard,* in *Textile Workers Union of America v. Darlington Mfg. Co.,* 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965), the Supreme Court confronted a management decision to terminate business operations after a union won a representation election in the employer's mill. The union claimed that the closing violated sections 8(a)(1) and 8(a)(3)[13] of the Act be-

---

same work under similar conditions of employment—is a statutory subject of collective bargaining...." *Id.* at 405.

**12.** In *First National Maintenance,* the Court wrote:

"... [I]n establishing what issues must be submitted to the process of bargaining, *Congress had no expectation that the elected union representative would become an equal partner* in the running of the business enterprise in which the union's members are employed. *Despite the deliberate open-endedness of the statutory language, there is an undeniable limit to the subjects about which bargaining must take place*:

"'Section 8(a) [*sic* *] of the Act, of course, does not immutably fix a list of subjects for mandatory bargaining [quoting from the *Allied Chemical & Alkali Workers* opinion which cited, *inter alia,* Justice Stewart's concurring opinion in *Fibreboard* ].... But it does establish a limitation against which proposed top-ics must be measured. In general terms, the limitation includes only issues that settle an aspect of the relationship between the employer and the employees.' [*Allied* ] *Chemical & Alkali Workers v. Pittsburgh Plate Glass Co.,* 404 U.S. 157, 178, 92 S.Ct. 383, 397 [**], 30 L.Ed.2d 341 (1971)." *First National Maintenance Corp. v. NLRB,* 452 U.S. 666, 101 S.Ct. 2573, 2579, 69 L.Ed.2d 318 (1981) (emphasis added).

(* *Allied Chemical & Alkali Workers* referred to section 8(d) rather than section 8(a), *see,* 404 U.S. at 178, 92 S.Ct. at 397.) (** We note that this passage is misprinted in 92 S.Ct. at 397 (2d reprint 1982) as, "But it does *not* establish a limitation against which proposed topics must be measured." (Emphasis added.) *But see* 404 U.S. at 178 ("... it does establish a limitation....").)

**13.** These sections provide:

"(a) It shall be an unfair labor practice for an employer—

cause it interfered with the employees' right to organize a collective bargaining unit and discouraged membership in a labor union, and that the company had violated section 8(a)(5) by not meeting with the union to bargain after the election.

Although the record indicated that Darlington's decision to close the mill was almost certainly motivated by the employer's antiunion animus, the Court concluded that "some employer decisions are so peculiarly matters of management prerogative that they would never constitute violations of § 8(a)(1), whether or not they involved sound business judgment, unless they also violated § 8(a)(3)." 85 S.Ct. at 999.

Noting that the family controlling the Darlington mill had significant other interests in the textile business, *id.* at 997, the Court distinguished between a complete closure of an employer's entire business and the closure of one part of an employer's enterprise "motivated by a purpose to chill unionism in any of the remaining plants of the single employer." [14] The opinion also suggested an outer limit for the scope of mandatory bargaining: "[W]hen an employer closes his entire business, even if the liquidation is motivated by vindictiveness toward the union, such action is not an unfair labor practice." *Id.* at 1001. "The closing of an entire business, even though discriminatory, ends the employer-employee relationship; the force of such a closing is entirely spent as to that business when termination of the enter-

prise takes place." *Id.* at 1002. The Court imposed no obligation on an employer to bargain about the decision to go out of business completely, even if that decision arose from the employer's vindictive refusal to deal with a union.[15]

*Fibreboard* and *Darlington* addressed polar situations in which mandatory bargaining is and is not required under the Act. The two opinions, however, to some extent only defined the outer boundaries around a large zone of uncertainty covering a number of business conduct decisions. Included in this gray area were management decisions to automate or relocate a plant, or to close down only part of a business' operations for economic or other reasons that did not involve antiunion animus. In *First National Maintenance,* the Supreme Court returned to section 8(a)(5) in the context of a partial closing motivated neither by labor-cost considerations nor by the desire to chill unionism in other portions of the employer's operations.

### B. First National Maintenance *and Partial Closings*

#### 1. The Factual Setting *of* First National Maintenance

*First National Maintenance* involved a firm (FNM) that provided contract cleaning, maintenance, housekeeping, and related services for various commercial customers. A specific staff of FNM employees serviced each account, and employees were not transferred between locations. Cus-

---

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

"....

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization...." 29 U.S.C. § 158.

**14.** *Id.* 85 S.Ct. at 1002. The Court described the situation as a "partial closing." *Id.* It further noted that the NLRB had concluded Darlington was only one part of a larger textile enterprise, but held that the NLRB's findings did not establish "the factors of 'purpose' and 'effect'"—that the Darlington closure was intended to chill unionization in the other family-controlled plants and had that result. *Id.* at 1003. For this reason, the Court remanded the

matter to the NLRB for findings on the elements of purpose and effect.

**15.** *Darlington* is generally viewed as indicating that the Act does not require mandatory bargaining for a total shutdown, and decisions by both the NLRB and Courts of Appeals have relied on *Darlington* in concluding that there is no duty to bargain about the decision to go out of business. *E.g., NLRB v. Production Molded Plastics,* 604 F.2d 451, 453 (6th Cir.1979); *Ozark Trailers, Inc.,* 161 N.L.R.B. 561, 564–65 (1966). *See also First National Maintenance, supra,* at 2580 (discussing class three decisions and citing *Darlington* ). *But see* Note, *Mandatory Bargaining and the Disposition of Closed Plants,* 95 Harv.L.Rev. 1896, 1906 n. 54 (1982) (commenting that *Darlington* did not directly rule on section 8(a)(5)).

tomers agreed to furnish all tools, equipment, and supplies and to reimburse FNM for all its labor costs respecting its employees working at the customer's location, plus a set fee for FNM's management and supervision.

Shortly after FNM's employees voted to form a bargaining unit as part of a national union, FNM began to serve a nursing home, Greenpark, under an agreement providing that, *inter alia*, FNM would receive a $500 weekly fee. FNM employed approximately thirty-five employees to service the account. At some point, FNM's fee was reduced to $250. FNM later determined it was losing money on the contract and notified Greenpark that the agreement would be terminated unless the $500 fee were reinstated, an offer that apparently did not stir Greenpark's interest. About one week thereafter, and without consulting the union, FNM notified its Greenpark employees that they would be discharged three days later, on the final day FNM was obliged to service the Greenpark account. The union requested in vain that termination of the contract be delayed to permit bargaining.

After the employees were discharged, the union filed an unfair labor practice charge alleging violations of sections 8(a)(1) and 8(a)(5). The NLRB found in favor of the union on the premise that an employer was obligated to bargain about a decision to close down part of its business.

Questioning the NLRB's apparent reliance on a *per se* rule requiring bargaining for any partial closing, the Second Circuit enforced the order, but held that no *per se* rule could govern all partial closings. The Court of Appeals, instead, concluded that section 8(d) "creates a *presumption* in favor of mandatory bargaining over such a decision" rebuttable if an employer can show that " 'bargaining over the decision would be futile,' or that the decision was due to 'emergency financial circumstances,' or that the 'custom of the industry ... is not to bargain over such decisions.' " *First National Maintenance*, 101 S.Ct. at 2577 (emphasis in original; describing history of case, citing 627 F.2d 596, 601–02 (2d Cir.1980)).

The Supreme Court rejected the Second Circuit's use of a presumption in favor of mandatory bargaining. Instead, apparently employing a balancing test, the Court concluded "that the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business *purely for economic reasons* outweighs the incremental benefit that might be gained through the union's participation in making the decision," and held that FNM's decision to terminate the Greenpark operation was hence not a mandatory subject of bargaining. *Id.* at 2584 (emphasis added; footnote omitted.)[16]

---

**16.** The Court cautioned, however, that bargaining about the *effects* of an employer's decision to close down a business completely or in part is mandatory. 101 S.Ct. at 2580 n. 15.

We note that commentators discuss *First National Maintenance* as though it created a *per se* rule for *all* partial closings, without indicating whether this *"per se* rule" reaches an employer decision motivated *in part* by labor-cost considerations. *E.g.*, George, *To Bargain or Not Bargain: A New Chapter on Work Relocation Decisions,* 69 Minn.L.Rev. 667, 680 & n. 64 (1985) (stating *First National Maintenance* adopted "a case-by-case balancing test [but then applied] the test in such a way as to create a per se rule of not requiring bargaining for partial closure decisions"; citing other commentators' conclusions that the Court had adopted a *per se* rule for partial closings); Gorman, *The Negligible Impact of the National Labor Relations Act on Managerial Decisions to Close or Relocate,* 58 Tul.L.Rev. 1354, 1362–63 (1984) (stating it is "rather clear that [*First National Maintenance* ]

intended to announce a per se rule. Both the General Counsel and the NLRB appear so to concede." (footnotes omitted)); Harper, *Leveling the Road from Borg-Warner to First National Maintenance: The Scope of Mandatory Bargaining,* 68 Va.L.Rev. 1447, 1461 (1982) (describing *First National Maintenance* as "provid[ing] a clear rule for one class of employee decisions"). *But see* Note, *Labor Law—A Balancing of Interests Test Applied to the Duty to Bargain about a Partial Closing Decision,* 61 N.C.L.Rev. 365, 375 & n. 81 (1983) (discussing apparent *per se* rule of *First National Maintenance* but concluding "that the Court did not intend to establish a per se rule that an employer never has a duty to bargain over a partial closing decision is clear.").

Even a broad *per se* rule that an employer has no duty to bargain about a partial closing decision does not, however, foreclose the possibility that a partial closing with the purpose and effect of chilling unionism in an employer's remaining business activities may violate section

## 2. First National Maintenance *Balancing*

The Supreme Court followed Justice Stewart's *Fibreboard* opinion by identifying three categories of business conduct decisions. Excluding from consideration the first two classes—decisions that are clearly either exempt from or subject to mandatory bargaining [17]—*First National Maintenance* focused on the third category of business conduct decisions,[18] those that might or might not be subject to mandatory bargaining. FNM's decision to stop servicing Greenpark was within this class, because a management decision

"involving a change in the scope and direction of the enterprise, is akin to the decision whether to be in business at all, 'not in [itself] primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment.' *Fibreboard*, 379 U.S., at 223, 85 S.Ct., at 409 (STEWART, J., concurring).... At the same time, this decision touches on a matter of central and pressing concern to the union and its member employees: the possibility of continued employment and the retention of the employees' very jobs." 101 S.Ct. at 2580.

The Court then posed its pivotal question—"whether the decision itself should be considered part of [FNM's] retained freedom to manage its affairs unrelated to employment," *id.*—and undertook the following analysis:

"The concept of mandatory bargaining is premised on the belief that collective discussions backed by the parties' economic weapons will result in decisions that are better for both management and labor and for society as a whole.... This will be true, however, *only if the subject proposed for discussion is amenable to resolution through the bargaining process. Management must be free from the constraints of the bargaining process to the extent essential for the running of a profitable business.* It also must have some degree of certainty beforehand as to when it may proceed to reach decisions without fear of later evaluations labeling its conduct an unfair labor practice.... [I]n view of an employer's need for unencumbered decision-making, *bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business.*" *Id.* at 2580–81 (emphasis added; citations and footnotes omitted).

Examining the burden mandatory decision bargaining would have placed on the employer in *Fibreboard*, the Court noted that the management decision to contract for its internal maintenance work neither required capital investment nor altered the employer's basic operations. The Court wrote that *Fibreboard* had identified the employer's "desire to reduce labor costs" as "a matter 'peculiarly suitable for resolution within the collective bargaining framework.'" Taken together, the prevalent industrial practice of "bargaining over 'con-

---

8(a)(3). 101 S.Ct. at 2582 (stating section 8(a)(3) "prohibits partial closing motivated by anti-union animus"). This Circuit has found such a violation in a partial closing after *First National Maintenance. NLRB v. Robin American Corp.,* 667 F.2d 1170 (5th Cir.1982); *see also Weather Tamer, Inc. v. NLRB,* 676 F.2d 483, 487–93 (11th Cir.1982).

17. The Court described as not subject to mandatory bargaining "management decisions, such as choice of advertising and promotion, product type and design, and financing arrangemei.is, [that] have only an indirect and attenuated impact on the employment relationship." 101 S.Ct. at 2580. Other decisions, affecting "order of succession of layoffs and recalls, production quotas, and work rules, are almost exclusively an 'aspect of the relationship' between employer and employee" and are within the mandatory bargaining category. *Id.*

18. The Court described the partial closing at issue as the

"third type of management decision, one that had a direct impact on employment, since jobs were inexorably eliminated by the termination [of the contract], but has as its focus only the economic profitability of the contract ..., a concern under these facts wholly apart from the employment relationship." 101 S.Ct. at 2580.

tracting out'" and the extent to which the employer relied on the labor-cost factor in making the decision to "contract out" demonstrated "the 'amenability of such subjects to the collective bargaining process.'" *Id.* at 2581 (quoting *Fibreboard;* citations omitted).

*First National Maintenance* then discussed this benefit/burden standard both generally and as applied to partial closings. *Id.* at 2581–85.[19] It concluded that a partial closing "purely for economic reasons" is not part of the "terms and conditions of employment" for which bargaining is mandatory. *Id.* at 2484–85. With respect to other management decisions apparently of the third category, the Court observed in its possibly significant footnote 22:

> "In this opinion we of course intimate no view as to other types of management decisions, such as *plant relocations,* sales, other kinds of subcontracting, automation, etc., *which are to be considered on their particular facts.* See, *e. g., International Ladies' Garment Workers Union v. NLRB,* 150 U.S.App. D.C. 71, 463 F.2d 907 (1972) (*plant relocation predominantly due to labor costs*); *Weltronic Co. v. NLRB,* 419 F.2d 1120 (CA6 1969) (*decision to move plant three miles*), cert. denied, 398 U.S. 938, 90 S.Ct. 1841, 26 L.Ed.2d 270 (1970); *Dan Dee West Virginia Corp.,* 180 N.L. R.B. 534 (1970) (decision to change method of distribution, under which employee-

drivers became independent contractors); *Young Motor Truck Service, Inc.,* 156 N.L.R.B. 661 (1966) (decision to sell major portion of business). See also Schwartz, Plant Relocation or Partial Termination—The Duty to Decision-Bargain, 39 Ford.L.Rev. 81, 100–102 (1970)." 101 S.Ct. at 2584 n. 22 (emphasis added).

In a subsequent section of the opinion, the Court, "to illustrate the limits of our holding," turned "again to the specific facts of this case," noting, among other things, that the employer "had no intention to replace the discharged employees or to move that operation elsewhere," that its "sole purpose was to reduce its economic loss," that there was no "antiunion animus," and that the "union had no control or authority over" the disputed management fee.[20] *Id.* at 2585. The Court also observed that the absence of significant capital investment or withdrawal was not "crucial" in this instance. *Id.*

Because we must determine if the NLRB's interpretation and application of the Act in light of *First National Maintenance* in this case was reasonably defensible, we turn to the Board's analysis of the dictates of that opinion.

## IV.

In the instant case, the ALJ, whose decision was adopted by the Board majority,

**19.** The Court noted:

"[T]he Act is not intended to serve either party's individual interest, but to foster in a neutral manner a system in which the conflict between these interests may be resolved. It seems particularly important, therefore, to consider whether requiring bargaining over this sort of decision will advance the neutral purposes of the Act." *Id.* 101 S.Ct. at 2582. On the benefit side of the scale, the Court considered only benefits to the *collective bargaining process* rather than any advantages of bargaining that might accrue to the specific employees affected by the decision, and it excluded from benefits that can be weighed any attributable to other provisions of law, such as effects bargaining or protection against closings motivated by antiunion animus. The opinion appears to identify no benefit that was deemed significant on the facts before the Court.

Potential burdens on management described by the Court included the loss of "speed, flexibil-

ity, and secrecy in meeting business opportunities and exigencies," and the risk of economic damage if "a successful transition" were impeded or if an employer made a decision without bargaining and the decision was retrospectively determined to have been subject to mandatory bargaining. *Id.* at 2583–84. The Court did not suggest that most or all of these "burden" considerations were applicable in FNM's decision to stop servicing one nursing home.

**20.** It is, of course, true that the union did not have control over the management fee, and indeed that under the expiring contract with Greenpark labor costs were borne by it rather than FNM. Nevertheless, a relatively small wage reduction (which could have been guaranteed to Greenpark) would have made up the disputed $250 a week (at forty hours per week for each of thirty-five employees, eighteen cents an hour would have sufficed for this purpose).

found that Inland's relocation was not predominantly due to, and did not turn upon, labor costs:

> "[W]hile noting that [Inland Container] had long pursued steps to reduce the contractual labor costs, and that this factor helped trigger a search for a new location, I find that the essence of the 'decision' itself was *not predicated* solely or even *predominantly upon labor costs*, but ... by a need to replace an inadequate facility. *As the 'decision' did not turn upon labor costs, it was not subject to mandatory bargaining* and Respondent was therefore at liberty to unilaterally decide to relocate...." ALJ Opinion, at 17 (emphasis in original and added; citations omitted).

As interpreted by the ALJ, NLRB precedent, most notably *Otis II*, defined a class three decision as subject only to permissive bargaining if the " 'decision' did not turn upon labor costs." Because the ALJ's fact-findings, which the Board adopted, are supported by substantial evidence and are unchallenged, the sole issue before us is whether the *Otis II* standard is reasonably defensible in this class of case.

### A. The NLRB's Otis II Decision

The *Otis* decisions directly addressed a form of relocation. The Otis Elevator Company was acquired by another company, which decided to close down some of Otis' research and development programs and to consolidate Otis' research work with that taking place in the parent company's existing, more modern research center. In March 1981, the NLRB decided that the employer's refusal to bargain with the union about this decision was an unfair labor practice because work unit relocation was a mandatory bargaining subject. *Otis Elevator Co. (Otis I)*, 255 N.L.R.B. 235 (1981). *Otis I* was on appeal in the District of Columbia Circuit when *First National Maintenance* was handed down and, at the Board's request, the Court of Appeals re-

manded the case "for reconsideration in light of the Supreme Court's decision." *Otis II*, 269 N.L.R.B. 891 (1984).

Reversing its earlier conclusion that a relocation decision was a mandatory bargaining subject, the NLRB attempted to apply the standards *First National Maintenance* had set forth for partial closings to the different factual setting before it. The four Board members participating in the ruling all agreed that mandatory bargaining was not appropriate for the parent company's relocation decision. However, the Board members in *Otis II* relied on three different rationales to reach this result. The three *Otis II* opinions illustrate alternative possible readings of *First National Maintenance*.

#### 1. The Plurality's Interpretation of First National Maintenance

The plurality opinion, representing the views of Chairman Dotson and Member Hunter, concluded that

> "for the reasons the Court gave in *First National Maintenance*, ... we hold that excluded from Section 8(d) of the Act are decisions which affect the scope, direction, or nature of the business.... We emphasize ... that the appellation of the decision is not important....
>
> "... *Included within Section 8(d), however, ... are all decisions which turn* upon a *reduction of labor costs.* This is true whether the decision may be characterized as subcontracting, reorganization, consolidation, or relocation, if the decision in fact *turns on direct modification of labor costs* and not on a change in the basic direction or nature of the enterprise." *Otis II, supra*, at 893 (footnote omitted; emphasis added).

The plurality opinion offered examples of "decisions which affect the scope, direction, or nature of the business," [21] but emphasized that "the critical factor" was whether

---

**21.** This category was described as including "decisions to sell a business or a part thereof, to dispose of its assets, to restructure or to consolidate operations, to subcontract, to invest in labor-saving machinery, to change the methods of finance or of sales, advertising, product design, and all other decisions akin to the foregoing." *Otis II, supra*, at 893 & n. 5 (also mentioning mergers).

such a management decision "turns upon labor costs." *Id.* at 892.

The plurality grounded its decision in the *Fibreboard* and *First National Maintenance* opinions as follows:

"[W]e ... find under the guidance of *First National Maintenance* that the [company's] decision turned not upon labor costs, but instead turned upon a change in the nature and direction of a significant facet of its business. Thus it constituted a managerial decision of the sort which is at the core of entrepreneurial control outside of the limited scope of Section 8(d).

"Our understanding of the Court's construction of Section 8(d) is best explicated by Mr. Justice Stewart's concurring opinion in *Fibreboard* ... explicitly relied on by the Court in *First National Maintenance:* '... those management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from [mandatory bargaining].'" *Otis II, supra,* at 891.

The opinion explained why a core management decision based in some degree—but not primarily—on labor-cost considerations should be exempt from mandatory bargaining:

"[I]t is also evident that labor costs often are among the considerations which cause management to decide to alter the scope or direction of its business. The Court in *First National Maintenance* stated with respect to partial closings that: 'If labor costs are an important factor in a failing operation and the decision to close, management will have an incentive to confer voluntarily with the Union to seek concessions that may make continuing the business profitable.' 452 U.S. at 682, 101 S.Ct. at 2582. The Court nevertheless found that this factor was insufficient to put the [partial closing] decision within Section 8(d).... The Court reasoned that *if labor costs were a factor, that element of the decision could be adequately dealt with in effects bargaining.* We discern no sub-

stantial reason why this analysis is not equally applicable to other decisions which turn upon a significant change in the nature or direction of a business." *Otis II, supra,* at 893–94 (emphasis added; citations omitted).

Plainly stated, the *Otis II* plurality rule requires bargaining for class three management decisions if, but only if, the decision "turns upon labor costs."

### 2. The Otis II Concurring Opinions

Member Dennis concurred only in the result. Under Member Dennis' interpretation of *First National Maintenance,* a two-part inquiry into class three type management decisions was appropriate. The first inquiry should be whether determination of the decision to be made " 'is amenable to resolution through the bargaining process.' " *Otis II* at 897. This, in turn, depends on whether "the union has control (e.g., labor costs)" over "a significant consideration in the employer's decision." *Id.* If the answer is negative, the decision is not subject to mandatory bargaining. If the answer is affirmative, mandatory bargaining is nevertheless required only if the second requirement is met: the burdens of management constraints resulting from mandatory bargaining, considered in the light of factors such as the extent of operational change and capital commitment and the need for speed, flexibility, and confidentiality, must not outweigh the benefit of bargaining about a matter potentially subject to resolution through that process. *Id.* The initial amenability inquiry in the Dennis formulation is apparently somewhat less restrictive than the plurality's "turns upon labor costs" test, in that Member Dennis may not restrict matters over which "the union has control" to "labor costs" and also may not require that such matters be as important to the decision. On the other hand, the plurality, unlike Member Dennis, does not have any separate balancing test which must be met. Member Dennis concluded that the relocation decision at issue in *Otis II* was not a mandatory subject of bargaining as it was not amenable to resolution through that process because "[t]here was nothing that the Un-

ion could have offered that reasonably could have affected management's decision." *Id.* at 899.

Member Zimmerman agreed that mandatory bargaining was not required respecting the relocation decision in *Otis* as it was not amenable to resolution through bargaining because "[n]o concession proposed by the Union could reasonably be expected to alter the Respondent's concerns." *Otis II* at 901 (Member Zimmerman concurring). However, Member Zimmerman, far more plainly than Member Dennis, would not restrict mandatory bargaining to those instances where *labor* costs as such were significant in the employer's decision. In his view, "[a] decision may be amenable to resolution through bargaining where the employer's decision is related to overall enterprise costs not limited specifically to labor costs" if "union concessions may substantially mitigate the concerns underlying the employer's decision." *Id.* at 900–901. Where there is "union[ ] capacity to affect the employer's decision," he would require

mandatory bargaining "absent any showing of the employer's urgent need for the kind of speed, flexibility, or secrecy as referred to by the Court in *First National Maintenance.*" *Id.* at 901.

### B. The Otis II *"Turns Upon Labor Costs"* Standard

The Board members' disparate interpretations of *First National Maintenance* in *Otis II* demonstrate that the Supreme Court's opinion did not lay out with unmistakable clarity precisely how the NLRB was to apply its teachings. Commentators offer little guidance about whether the Supreme Court intended *First National Maintenance* to require the Board to apply the balancing test in all future class three cases except partial closings,[22] but their discussions of *Otis II* generally assume that the Court mandated that the Board apply the benefit/burden analysis and focus on a perceived failure of the *Otis II* Board to do so.[23]

**22.** Legal writers typically criticize *First National Maintenance* without suggesting how the opinion should be interpreted and applied in other cases. *E.g.,* George, *Collective Bargaining in Chapter 11 and Beyond,* 95 Yale L.J. 300, 336–40, 340 (1985) ("The *First National Maintenance* balancing test will become meaningless rhetoric if applied to other management decisions in a similar fashion."); George, *see* note 16, *supra,* at 669–70 (suggesting balancing test lacks predictability); *id.* at 669 n. 17 (listing articles critical of the decision); Gorman, *see* note 16, *supra,* at 1361–64 (criticizing the opinion); Harper, *see* note 16, *supra,* at 1453–62, 1462 (analyzing the decision and stating the opinion "does not provide a workable principle for other types of employer decisions"); Whelan, *Labor Law Reform and Comparative Law,* 63 Texas L. Rev. 1425, 1444 (1985) (describing opinion as "resting on speculation"); Note, *An Economic Case for Mandatory Bargaining over Partial Termination and Plant Relocation Decisions,* 95 Yale L.J. 949, 968 (1968) (indicating *First National Maintenance* and subsequent Board decisions "fail to maximize economic efficiency"); Note, *A Balancing of Interests, see* note 16, *supra,* at 365 ("[T]he terms used in the balancing test are of questionable origin, are inherently vague, and are left inadequately defined in the opinion."); *id.* at 373 ("[C]onfusion among the lower courts will probably follow....").

**23.** This is the most common criticism of *Otis II. E.g.,* George, *see* note 16, *supra,* at 669 ("Only one [Board] member attempted a facsimile of the [*First National Maintenance* ] balancing test.

The remaining Board members, in two separate opinions, created additional threshold tests that neither comply with [*First National Maintenance* ] nor provide a consistent approach for future application."); *id.* at 689 ("Although each of the *Otis II* opinions purported to apply [*First National Maintenance* ] to the relocation issue presented, three of the four Board members inexplicably failed to acknowledge the benefit/burden analysis...."); *id.* at 691 (stating plurality opinion's "'labor costs' inquiry is decidedly narrower than [*First National Maintenance* ] mandates. The substitution of an 'either/or' threshold test for the balancing required ... seems inconsistent with the duty of the Board to enforce the NLRA as interpreted by the Supreme Court."); *id.* at 693 ("... Member Zimmerman's ... exclusive focus on 'amenability' is also inconsistent with the Supreme Court's mandate."); *id.* at 694 ("Member Dennis's balancing test is consistent with [*First National Maintenance* ], but her imposition of an 'amenability' threshold requirement causes problems similar to those that plague the Zimmerman approach. In defining amenability, Member Dennis seemed to adopt the more expansive concept of Member Zimmerman rather than the restrictive Dotson/Hunter 'labor costs' criterion.") (footnotes omitted); Gorman, *see* note 16, *supra,* at 1365–66 ("It remains to be seen whether the variant analytical tests proposed by the Board members will lead to differing conclusions in future cases.").

These varied readings of *First National Maintenance's* requirements by the Board members, together with those of legal writers, suggest—even if it can be assumed that the opinion mandates a particular analytical framework for other cases—that the Court did not delineate a specific methodology or process for the Board that is so unambiguous and plain as to deprive the Board of all discretion in determining how to decide future cases.

## V.

The Union characterizes *First National Maintenance* as having applied a benefit/burden balancing test to achieve a *per se* across-the-board rule for one specific category of class three decision, namely, partial closings, with the result that *all* such decisions (at least where not motivated by antiunion animus) are exempt from mandatory bargaining.[24] It then asserts that *First National Maintenance* accordingly requires the Board to apply the same balancing test separately to each and every other category of class three decision in order to achieve a *per se* across-the-board rule for each such separate category, so that, for example, there would be one rule applicable to *all* plant relocation decisions, regardless of the facts or circumstances which might be present in any particular instance. The Union argues that the Board failed to follow this methodology, and that if it had done so it would have concluded that *all* plant relocation decisions are subject to mandatory bargaining. Alternatively, the Union contends that if *First National Maintenance* does not require the Board to achieve a *per se* across-the-board rule for each separate category of class three decision, then it requires the Board to apply the full balancing test on an individual basis to the particular facts of each case. We reject these contentions, and hold that the Board acted within its broad discretion in applying its "turns upon labor costs" analysis to a plant relocation decision.[25]

## VI.

Some support for the Union's claim that the Board must adopt a *per se* rule for all plant relocations is afforded by the language in *First National Maintenance* that, in addition to management's need to "be free from the constraints of the bargaining process to the extent essential for the running of a profitable business," it "also must have some degree of certainty beforehand as to when it may proceed to reach decisions without fear of later evaluations labeling its conduct as an unfair labor practice." 101 S.Ct. at 2580–81. *See also id.* at 2584. Doubtless greater predictability would be enhanced by holding that all plant relocation decisions are subject to mandatory bargaining, as opposed to only those which turn on labor costs. We observe, however, that the employer will generally be aware of whether the decision turns on labor costs. While the Union may have less information in this regard, it too will often be sufficiently informed to protect its rights. Further, given that the decision in *First National Maintenance* appears to be based in substantial part on management's need to operate freely and speedily in the class three decision area, it would seem anomalous to *wholly* sacrifice those goals to the evidently subsidiary goal of enhanced predictability, especially where in many instances the decision would not be amenable to resolution through the bargaining process.

Moreover, it is by no means entirely clear that *First National Maintenance* adopted a *per se* rule for *all* partial closings. It expressly spoke only to those taken "purely for economic reasons." *Id.* at 2584. Earlier language in the opinion suggests that this embraces cases where "labor costs are an important factor in a failing operation," *id.* at 2582, and where "labor costs may not be a crucial circumstance in a particular economically based partial termination." *Id.* at 2584. But what of the case where labor costs as such are not only

---

24. As previously observed, some commentators have similarly analyzed *First National Maintenance. See* note 16, *supra.*

25. We are not here called upon to decide whether the Board may properly apply this analysis to other categories of class three decisions.

"important" to but are indeed the entire cause of a particular partial termination? It is unclear whether *First National Maintenance* dictates a no mandatory bargaining result in such instances. Doubt on this score is reinforced by part III B of the opinion where the Court stated, "In order to illustrate the limits of our holdings, we again turn to the specific facts of this case." *Id.* at 2585. The Court then called attention, among other things, to the fact that the termination resulted from the size of the disputed management fee which "[t]he union had no control or authority over." *Id.*

Finally, the reference in footnote 22 of *First National Maintenance* to intimating "no view as to other types of management decisions" does not clearly call for a *per se* across-the-board rule as to each of the there mentioned types. The Court says these "are to be considered on their particular facts," and the first example thereafter given is *International Ladies' Garment Workers Union v. NLRB*, 463 F.2d 907 (D.C.Cir.1972), which the Supreme Court characterizes as an instance of "plant relocation predominantly due to labor costs." This does not suggest that all plant relocations must be subject to a single *per se* rule, so that all must require, or all must reject, mandatory bargaining. Nor does it suggest any proscription of distinguishing for this purpose between plant relocations on the basis of whether or not labor costs are the predominant factor in the decision.

Likewise, we reject the Union's alternative argument that *First National Maintenance* requires that the Board apply a benefit/burden balancing test *ad hoc* to the particular circumstances of each individual case involving a class three decision that comes before it. Given the inherent unquantifiability of many of the factors considered important in *First National Maintenance*, such as management's need for flexibility and speed, an *ad hoc* approach

would likely be far more destructive of predictability than the Board's "turns upon labor costs" standard. Had the Court intended for all future cases to be decided on the basis of a wholly *ad hoc* balancing process, one would have expected it to have expressly said so. Moreover, the Court's general language concerning employer decisions "whether to shut down part of its business purely for economic reasons," *id.* at 2584, even if subject to qualification for instances where labor costs are the predominant factor on which the decisions turn, is nevertheless difficult to reconcile with an intention to require the Board to adopt a wholly *ad hoc* approach for every individual case.

As to economically motivated partial closings, or at least those not turning on labor costs, *First National Maintenance* provides the ultimate substantive answer: the Board exceeds its authority in determining that the Act prescribes mandatory collective bargaining. Beyond this, *First National Maintenance* disclaims dictation of any particular substantive results. However, it is fair to conclude that in the course of reaching its limited substantive determination, *First National Maintenance* also suggests that the Board, in respect to class three decisions generally, should give significant consideration, as it had perhaps insufficiently done in the past, both to management prerogatives and to the extent to which such decisions are as a meaningful and practical matter subject to resolution through the collective bargaining process. Nevertheless, we do not read *First National Maintenance* as dictating to the Board any particular methodology or formula which it must follow in order to adequately take such crucial factors into account, or as proscribing any particular such methodology or formula. Hence we reject the Union's contention that *First National Maintenance* requires the Board either to adopt a single *per se*, across-the-board result for all plant relocations [26] or to

---

**26.** The Union also suggests that instead of treating all plant relocations as the same type of class three decision, the Board might divide plant relocations into two types: those "to a not-yet-operating facility," and all others. The former type, of which this case is an example, is claimed to present the stronger case for an across-the-board *per se* rule of mandatory bargaining. We conclude, however, that the Board is not required to treat relocations "to a not-yet-

approach all such decisions on a strictly individual case and *ad hoc* balancing basis.

### VII.

■ We now address whether *Otis II's* "turns upon labor costs" standard, as applied to a plant relocation such as that here, is a reasonably defensible interpretation of the Act in light of *First National Maintenance* and earlier Supreme Court precedent. We hold that it is.

What is involved here, and in similar cases, are two interrelated decisions, each clearly lying at the core of entrepreneurial control: the decision to permanently close a facility at a particular location, and the decision to acquire a new site and facility at a different location which will perform some or all of the closed facility's functions. Typically, significant capital outlays will be involved. The former decision, standing alone, is clearly at least very similar to a partial closing, the kind of class three decision considered in *First National Maintenance*. The addition of the second decision does not enhance the adverse effects on the employees at the closed facility. Nor does it significantly dilute the character of the overall transaction as one lying at the core of entrepreneurial control.

Although in *First National Maintenance* the employer decided to cease doing business with a particular nursing home, there is no indication that it decided to contract its operations so that it would thenceforth serve fewer or smaller accounts, or to alter the character of its business by, for example, thereafter serving no nursing homes or serving no accounts in a particular geographic area or of a particular size.[27]

We conclude that the Board's "turns upon labor costs" standard is a reasonably defensible method of balancing the benefits of the collective bargaining process, which *First National Maintenance* identified as essentially amenability to resolution through the bargaining process, *see* note 19, *supra,* against the employer's need for unencumbered decision making in this area lying at the core of entrepreneurial control.

We recognize that other tests have been suggested. *First National Maintenance's* footnote 22 concludes with the citation "See also Schwarz, Plant Relocation or Partial Termination—The Duty to Decision-Bargain, 39 Ford.L.Rev. 81, 100–102 (1970)." In that article the following formula is proposed: "Decision-bargaining should be required in all cases where the

operating facility" as a type of relocation decision more deserving of mandatory collective bargaining than other relocation decisions.

We discern no significant difference between the two types of relocation decisions insofar as concerns amenability to resolution through the collective bargaining process. The Union contends that management's need for speed and secrecy is generally less when the destination facility is not yet operating, because building a plant takes a long time and is done in public. However, in such instances, the decision to permanently close a facility, and the decision to build or acquire another facility to which the former's function will be transferred, are frequently interdependent. And the decision to build or acquire the additional facility will often have to be made speedily and secretly in order to economically secure an appropriate site and take advantage of limited time capital availability. If no additional facilities are contemplated, indeed there may well be far less need for speed and secrecy in phasing out production at the facility to be closed and building it up at other facilities already owned and operating. Moreover, in the former situation, the decision whether to invest substantial new capital, gener-

ally considered to be at the core of entrepreneurial control, is less likely to be involved than in the latter. We recognize that *First National Maintenance* held that the absence of significant withdrawal or investment of capital in the particular case being considered was not fatal to the conclusion that bargaining was not mandatory. 101 S.Ct. at 2585. Nevertheless, we do not read the opinion as treating capital investment as an irrelevant consideration. *See id.* at 2581 (quoting passage from *Fibreboard* reflecting consideration of fact that "[n]o capital investment was required" in holding bargaining was mandatory).

27. *See First National Maintenance,* 101 S.Ct. at 2577 n. 5:

"The judge [the ALJ, whose findings were adopted by the Board] further found that petitioner's 'regular and usual' method of operation involved 'taking on, finishing, or discontinuing this or that particular job,' 242 N.L.R.B., at 466, and that '[t]here was no capital involved when it decided to terminate the Greenpark job. The closing of this one spot in no sense altered the nature of its business, nor did it substantially affect its total size.' *Ibid. . . .*"