853 F.2d 223
 128 L.R.R.M. (BNA) 3137, 57 USLW 2089,
109 Lab.Cas. P 10,651
 ARROW AUTOMOTIVE INDUSTRIES, INC., Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
International Union, United Automobile, Aerospace, and
Agricultural Implement Workers of America (UAW), Intervenor.
 No. 87-3105.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 8, 1988.
Decided Aug. 1, 1988.
 
 James F. Smith (Steven S. Greene, Constangy, Brooks & Smith, Atlanta, Ga., Paul Stanzler, Burns & Levinson, Boston, Mass., on brief), for petitioner.
 Frederick Havard, N.L.R.B. (Rosemary E. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate General Counsel, Aileen A. Armstrong, Deputy Associate Gen. Counsel, William R. Stewart, Deputy Asst. Gen. Counsel, Washington, D.C., on brief), for respondent.
 Wendy Kahn, Washington, D.C. (Jordan Rossen, Gen. Counsel, Michael B. Nicholson, Daniel W. Sherrick, Associate Gen. Counsel, Intern. Union, UAW, Detroit, Mich., on brief), for intervenor.
 Before WINTER, Chief Judge, and CHAPMAN and WILKINSON, Circuit Judges.
 WILKINSON, Circuit Judge:
 
 
 1
 Arrow Automotive Industries, Inc. appeals the National Labor Relations Board's decision that Arrow was obligated to bargain with Local 1596, International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, over Arrow's decision to close its Hudson, Massachusetts facility and perform the work previously done at that plant in Spartanburg, South Carolina. Because the Board's order contravenes controlling Supreme Court precedent, First National Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), we deny enforcement and hold that the company has no duty to bargain over the closing decision.I.
 
 
 2
 Arrow Automotive Industries, Inc. is a Massachusetts corporation engaged in the remanufacture and distribution of automobile and truck parts. Arrow operated plants in Hudson, Massachusetts, Spartanburg, South Carolina, Morrilton, Arkansas, and Vernon, California. Each plant engaged in the production of identical product lines, and each primarily served a market corresponding to its geographic area.
 
 
 3
 The Hudson plant had a history of unprofitable operations. The northeast market served by Hudson was declining, and sales from the plant fell over forty percent between 1976 and 1980. Labor costs at the Hudson plant were also higher than costs at Arrow's other facilities. As a result, the Hudson plant operated at a loss from 1977 on, with the exception of 1979, culminating in a loss of $1,092,000 in 1980. During this same period, Arrow was planning to open a new facility in Santa Maria, California, to replace the small Vernon plant and tap an expanding western market.
 
 
 4
 Beginning in 1978, Arrow management considered closing the Hudson plant in order to increase Arrow's profitability. Despite the declining market and escalating costs at the plant, Arrow President Harry Holzwasser apparently resisted the closure for sentimental reasons. Holzwasser's father had founded the company in Massachusetts, and he felt family ties to the Hudson operation.
 
 
 5
 The union had represented the employees at the Hudson plant since 1971 and had entered into a series of collective bargaining agreements, the last of which expired on November 30, 1980. Arrow and the union entered negotiations over a new agreement in October of 1980. The parties held a total of nine meetings between October 22 and November 30. The negotiations involved a number of issues, including wages, vacations and holidays, pension benefits, and, predominantly, health insurance. The parties failed to reach agreement on a new contract, and the union called a strike at the Hudson plant on November 30. Arrow thereupon began servicing the northeast from its Spartanburg facility. The parties met twice during the strike, but could not reach agreement despite Arrow's indication it might hire replacement workers or consider closing the plant. On March 2, 1981, the union membership voted to reject what turned out to be Arrow's final offer.
 
 
 6
 After the union vote, Arrow financial officer David Koontz prepared an analysis of the possible closing of Hudson. Koontz estimated that closing Hudson would increase the earnings per share of Arrow stock from $1.31 to $1.63, and concluded that the work done by the Hudson plant could be performed more efficiently at Spartanburg. During this same period, Arrow sent a telegram to the union withdrawing all of Arrow's contract proposals and stating that Arrow was debating whether to close the Hudson plant. Arrow's telegram requested a meeting with union representatives to discuss the closing decision.[1] Representatives of Arrow and the union met on March 23, 1981. The union, after being prompted by a federal mediator, reduced some of its contract demands, but the parties did not reach agreement.
 
 
 7
 On March 25, Arrow's Board of Directors met for three hours to consider the closing decision. The directors reviewed Koontz' conclusion that economic considerations supported the closing. Koontz told the Board that the Hudson work could be performed more efficiently in Spartanburg, and that the declining market and escalating costs at the Hudson plant meant that substantial savings would result from closure. Closure of Hudson could be expected to result in a $1.7 million increase in gross profit, an improvement of twenty-four percent. Koontz testified that he told the directors that closure of Hudson would also free substantial capital, which would be helpful in the upcoming opening of the Santa Maria plant. The minutes of the meeting, however, are ambiguous on the role of the Santa Maria plant in the decision to close Hudson. After discussion, the Board voted to close the Hudson plant. The parties have stipulated that the declining market and escalating production costs at Hudson led the directors to close the plant. There has been no finding that anti-union animus in any way influenced the closing decision.
 
 
 8
 Arrow informed the union by telegram on March 25 that it had decided to close the Hudson plant, and requested a meeting to bargain over the effects of the closing on the Hudson employees. On March 26, the union demanded that Arrow bargain further with it over the decision to close. Arrow declined to participate in further decision bargaining, and took the position that any further bargaining was to be restricted to the effects of the closing.[2]
 
 
 9
 On April 6, 1981, the union filed an unfair labor practice complaint with the National Labor Relations Board alleging that Arrow had failed to bargain over the decision to close the Hudson plant as required by section 8(a)(5) of the National Labor Relations Act, 29 U.S.C. Sec. 158(a)(5). Following a hearing, the Administrative Law Judge held on August 16, 1982 that Arrow did have an obligation to bargain over the closure decision. The ALJ found, however, that Arrow had satisfied its duty to bargain over the closing, and dismissed the complaint. The union and the NLRB's general counsel filed exceptions to the ALJ's determination that sufficient bargaining had occurred, and Arrow filed exceptions to the ALJ's holding that Arrow had a duty to bargain over the closing decision.
 
 
 10
 On June 25, 1987, almost five years after the exceptions and cross-exceptions were filed, the NLRB issued its decision. The Board found that Arrow had an obligation to bargain over the decision to close because the decision "turned on labor costs," and reversed the ALJ's finding that Arrow had satisfied its bargaining obligation. Arrow Automotive, Inc., 284 NLRB No. 57 (1987). The Board thus ordered Arrow to bargain with the union over the closing decision that had been made six years earlier. The Board further ordered Arrow to pay the Hudson workers their normal wages from March 25, 1981 until Arrow and the union reached agreement over the closing or bargained to impasse, or the union failed to request bargaining or failed to bargain in good faith. Arrow appeals.
 
 II.
 
 11
 The Supreme Court's decision in First National Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), governs our approach to this case. In First National Maintenance, the Supreme Court construed the provisions of the National Labor Relations Act, which requires employers and unions to bargain collectively "with respect to wages, hours, and other terms and conditions of employment." Refusal to bargain over such matters constitutes an unfair labor practice. See 29 U.S.C. Secs. 158(a)(5), 158(b)(3), and 158(d). In First National Maintenance, the Supreme Court held that an employer's partial closing decision is not a "term or condition of employment," and is therefore not a subject of mandatory bargaining. The Board contends that it has followed First National Maintenance in holding that any management decision that discontinues employment is a subject of mandatory bargaining if the decision "turns on labor costs." Arrow, on the other hand, argues that First National Maintenance precludes enforcement of the Board's bargaining order. We agree with Arrow and hold that it was not required to bargain over the decision to close the Hudson plant.
 
 
 12
 In First National Maintenance the Supreme Court held that a maintenance company's decision to terminate its service contract with one of its customers and discharge the employees who worked at that location was not a subject of mandatory bargaining. In so doing, the Court followed an approach suggested by Justice Stewart's Fibreboard concurrence, dividing management decisions into three groups. See Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 217-26, 85 S.Ct. 398, 406-11, 13 L.Ed.2d 233 (1964). First, some decisions, such as the choice of advertising, product type, and financing arrangements, "have only an indirect and attenuated impact on the employment relationship," and bargaining about these decisions is not required. First National Maintenance, 452 U.S. at 676-77, 101 S.Ct. at 2579-80. Other decisions, such as the order of layoffs and recalls, production quotas, and work rules, are "almost exclusively 'an aspect of the relationship' between employer and employee," and bargaining about them is mandatory. Id. at 677, 101 S.Ct. at 2580. Finally, the Court described a third type of management decision--that involved in First National Maintenance and here. Such decisions involve a "change in the scope and direction of the enterprise," but touch on "a matter of central and pressing concern to the union and its member employees: the possibility of continued employment and the retention of the employees' very jobs." Id. at 677, 101 S.Ct. at 2580.
 
 
 13
 Decisions in this third group are subject under First National Maintenance to a balancing analysis. Emphasizing the "employer's need for unencumbered decisionmaking" and the need for certainty as to legal requirements, the Court held that "bargaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." Id. at 679, 101 S.Ct. at 2581. The Court mentioned several factors that bear on whether bargaining should be required. Under the heading of "benefit for labor relations" are the amenability of the issue to resolution through collective bargaining, the length of the bargaining relationship that has existed between the parties, and whether effects bargaining has occurred. Under the "burden on the conduct of the business" are the magnitude of the change at issue, management's need for certainty, speed, flexibility, and secrecy in making decisions, and the possibility that mandatory bargaining could be used as a tool for union delay.
 
 
 14
 In a section of its opinion that focused on the interests of labor and management generally, rather than on the specific facts before it, the Court broadly concluded that a decision to close part of a business was not a mandatory subject of bargaining. Mandatory decision bargaining, the Court held, is not likely to augment the communication between management and employees that the policy of collective bargaining seeks to foster. The Court emphasized that the interests of the employees are significantly protected by the requirement of bargaining over the "effects" of a closing, id. at 681-82, 101 S.Ct. at 2582-83, and that the union is protected by section 8(a)(3) from a partial closing that is motivated by anti-union animus, id. at 682, 101 S.Ct. at 2582-83; see Textile Workers v. Darlington Manufacturing Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). The Court stated that where collective bargaining is likely to be useful in making a closing decision, management would have "an incentive to confer voluntarily with the union," 452 U.S. at 682, 101 S.Ct. at 2582, but that making the closing decision a mandatory subject of bargaining would create a risk of uncertainty and union delay, id. at 683-86, 101 S.Ct. at 2583-84. The Court concluded that "the harm likely to be done to an employer's need to operate freely in deciding whether to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision." Id. at 686, 101 S.Ct. at 2584.
 
 
 15
 In the next section of the First National Maintenance opinion, the Court returned to the specific facts before it, in order to "illustrate the limits" of its holding. Id. at 687, 101 S.Ct. at 2585. The Court mentioned several other factors that might be relevant to determining whether an employer was required to bargain over a decision. Id. at 687-88, 101 S.Ct. at 2585-86. Although the impact of this "limiting" section of the opinion has not been fully defined, a majority of commentators, including those who harshly criticize the First National Maintenance result, agree that the decision established a per se rule that an employer has no duty to bargain over a decision to close part of its business. See, e.g., George, To Bargain or Not to Bargain: A New Chapter in Work Relocation Decisions, 69 Minn.L.Rev. 667, 680 (1985) (Court applied its balancing test "in such a way as to create a per se rule of not requiring bargaining for partial closure decisions"); Harper, Leveling the Road from Borg-Warner to First National Maintenance: The Scope of Mandatory Bargaining, 68 Va.L.Rev. 1447, 1449, 1461 (1982) ("opinion at least provides a clear rule for one class of employer decisions"); Note, Unfair Labor Practice and Contract Aspects of an Employer's Desire to Close, Partially Close, or Relocate Bargaining Unit Work, 24 Duq.L.Rev. 285, 295-96 (1985) ("need for certainty led the Court to adopt a per se rule that partial closings for economic reasons are not mandatory subjects of bargaining"); The Supreme Court, 1980 Term--Leading Cases, 95 Harv.L.Rev. 91, 330, 334 (1981) ("Court constructed a per se rule by calculating burdens and benefits across widely divergent industries and collective bargaining configurations").
 
 
 16
 The Courts of Appeals have likewise agreed that under First National Maintenance, economically motivated partial closing decisions are not mandatory subjects of bargaining. See, e.g., International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. NLRB, 765 F.2d 175, 181 n. 23 (D.C.Cir.1985); NLRB v. Island Typographers, Inc., 705 F.2d 44, 50 n. 8 (2d Cir.1983); Vitek Electronics, Inc. v. NLRB, 763 F.2d 561, 565 n. 5 (3d Cir.1985); NLRB v. National Union of Hospital and Health Care Employees, 824 F.2d 318, 321 (4th Cir.1987); Local 2179, United Steelworkers v. NLRB, 822 F.2d 559, 567 (5th Cir.1987); Serrano v. Jones & Laughlin Steel Co., 790 F.2d 1279, 1287 (6th Cir.1986); Mason v. Continental Group, Inc., 763 F.2d 1219, 1224 (11th Cir.1985). It is against this backdrop of academic commentary, lower court interpretation, and clear language in First National Maintenance itself that we address the Board's decision.
 
 III.
 
 17
 We cannot accept the National Labor Relations Board's contention that the bargaining requirement it imposed on Arrow is consistent with the holding and the analysis of First National Maintenance. The Board failed to recognize that First National Maintenance requires that employers be free to act without the constraints of bargaining when undertaking a decision of the magnitude involved in this case. The Board's various attempts to distinguish this case from First National Maintenance are unpersuasive and fail to establish any obligation on the part of Arrow to bargain over the decision to close its Hudson plant.
 
 
 18
 The Board held that Arrow's decision to close Hudson was a mandatory subject of bargaining because the decision "turned on labor costs." The Board states that it applied the standard established in Otis Elevator Company, 269 NLRB 891 (1984) (hereinafter Otis II ) in reaching this conclusion. The plurality opinion in Otis II established a standard by which any management decision affecting employment security, regardless of the "appellation of the decision," is a mandatory subject of bargaining "if the decision in fact turns on direct modification of labor costs and not on a change in the basic direction or nature of the enterprise." Id. at 893. As a general matter, the Board's labor-costs standard provides scant guidance or predictability to companies faced with fundamental business decisions. It also establishes an exception to the First National Maintenance decision that threatens to swallow its rule. As one commentator has noted, the Board's standard is problematic in itself because "management decisions may turn on labor costs and involve a fundamental change in the business." George, supra, 69 Minn.L.Rev. at 689 n. 111.
 
 
 19
 The Board's standard presents even greater difficulties in this case. As applied to Arrow's decision, the standard is somewhat different from that originally set forth in Otis II. The Otis II standard apparently required bargaining only where a decision turned solely on labor costs. See Otis II, 269 NLRB at 895; George, supra, 69 Minn.L.Rev. at 690. Here, however, the parties stipulate that part of the basis for the Hudson closing was the declining northeast market served by the plant. The standard applied by the Board in this case may, therefore, require bargaining where a management decision is based on other considerations in addition to labor costs.
 
 
 20
 That part of the Board's standard relating to a "change in the basic direction or nature of the enterprise" is also unclear. In this case, the Board concluded that the closing of an entire manufacturing facility was not such a change. Yet this result would not have been easy to predict on the basis of earlier Board decisions. See Columbia City Freight Lines, 271 NLRB 12, 13 (1984) (closing of one freight terminal and transfer of work to another existing terminal a fundamental change); Otis II, 269 NLRB at 892 (closing of one research facility and consolidation of operations with those at another location a fundamental change). According to the the Board, however, the standard requires Arrow to bargain because labor costs played a major role in the decision to close and because the Hudson closing did not represent a significant change in Arrow's operations.
 
 
 21
 We reject the Board's labor costs analysis here because it is flatly inconsistent with First National Maintenance. Where an employer closes down part of its operation--in this case, by closing a plant--the Court has made clear that bargaining over the decision is not required. With regard to labor costs, the Court stated that where "labor costs are an important factor in a failing operation and the decision to close, management will have an incentive to confer voluntarily with the union to seek concessions that may make continuing the business profitable." 452 U.S. at 682, 101 S.Ct. at 2582-83 (emphasis added). Arrow's decision here fits squarely within the Court's statement, indicating that Arrow's decision was not a mandatory subject of bargaining.
 
 
 22
 The Board's standard simply fails to give sufficient weight to the magnitude of the change involved here. In First National Maintenance, a maintenance company's decision to terminate a contract with a single customer was the significant change in operations held to lie outside the scope of mandatory bargaining. The Court found that decision "a significant change" despite the fact that the employer's " 'regular and usual' method of operation involved 'taking on, finishing, or discontinuing this or that particular job.' " Id. at 671 n. 5, 101 S.Ct. at 2577 n. 5. Comparing these events to the shutdown of an entire manufacturing facility that was involved here, we hold that Arrow's decision to close Hudson qualified as a "significant change in operations" under First National Maintenance.
 
 
 23
 The Board appears to suggest that Arrow's decision is not governed by First National Maintenance by distinguishing between "labor costs" and "economic reasons" for a closing. There is no basis in the Supreme Court's cases for any such distinction. "Economic reasons" are not reasons distinct and apart from a desire to decrease labor costs. The Supreme Court uses the term "economic reasons" in contrasting business decisions from decisions based on anti-union animus. See, e.g., Fibreboard, 379 U.S. at 208, 85 S.Ct. at 401-02 (describing Fibreboard's decision to contract out work to save labor costs as "economic" rather than anti-union). Labor costs are inescapably a part of the economic picture of the enterprise, and management's consideration of them in basic business decisions does not render First National Maintenance inapplicable.
 
 
 24
 As a further aspect of its labor costs analysis, the Board contends that Arrow could not close the Hudson plant without bargaining because its closing decision was prompted by frustration with the collective bargaining process. The Board discounts the unprofitability of the Hudson plant as a motivation for the closing on the ground that Arrow had known of its losses for several years, yet did not close the plant until after its failed contract negotiations with the union. These arguments do not provide a basis for the Board's decision. It is well established that an employer may not partially close in order to avoid or damage a union. Textile Workers v. Darlington Manufacturing Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). But the parties have stipulated that "economic considerations"--declining sales volume and increased production costs--prompted the Hudson closing. Frustration with the course of labor relations may well play a part in prompting a company to consider closing a facility, but absent the unfair labor practices covered by Darlington, this frustration does not place a closing decision outside the rule of First National Maintenance.
 
 
 25
 The Board also makes much of the fact that the union offered concessions prior to the closing decision. Although this point more properly goes to the question of whether impasse was reached in the bargaining, we note that the union concessions do not alter the fact that Arrow had no obligation to bargain over the closing. It is true that, after being apprised of the possibility of closure, the union modified its bargaining position. As First National Maintenance emphasized, however, had the union offer presented any realistic chance of making continued operations at Hudson profitable, Arrow had every incentive voluntarily to pursue this possibility. See 452 U.S. at 682, 101 S.Ct. at 2582-83. The record suggests that this incentive would have been especially strong here, where sentimental reasons on the part of Arrow management kept the Hudson plant open for several years in the face of large losses. The record gives no indication that the union's offer might have made Hudson profitable. After the concessions, the union was still demanding a substantial increase in wages and benefits at a plant that was already losing large sums of money. The union's offer of concessions provides no basis for the imposition of a bargaining requirement here.
 
 
 26
 The Board next asserts that because the work previously done at the Hudson plant was transferred to Spartanburg, South Carolina, the Hudson closing should not be seen as a "partial closing" within the rule of First National Maintenance. The Board cites the Court's statement in First National Maintenance that it expressed "no view as to other types of management decisions, such as plant relocations, sales, other kinds of subcontracting, automation, etc., which are to be considered on their particular facts." Id. at 686 n. 22, 101 S.Ct. at 2584 n. 22. Although the Board's labor costs analysis does not depend on the "appellation" to be given a particular decision, the Board apparently suggests this case involves a "relocation" that requires bargaining despite First National Maintenance.
 
 
 27
 Spartanburg's assumption of the work previously done at Hudson does not affect the conclusion that Arrow underwent a "partial closing." The Supreme Court has defined a "partial closing" as "a closing of one or more facilities by the employer having more facilities than those which he is closing." Darlington, 380 U.S. at 275, 85 S.Ct. at 1002. Arrow's closure of Hudson obviously fits this definition. "Relocation" would seem to be a term more appropriate to those situations where an employer replaces an existing plant with a new plant that will perform the same work in a different place. Here, however, the closing decreased the number of Arrow plants, and altered the geographic focus of Arrow's operations. Many plant closings undoubtedly are followed, as was the one here, by expansions at a company's other facilities. This does not remove such closing decisions from the coverage of First National Maintenance.
 
 
 28
 We do not believe, in any event, that cases are to be resolved by placing decisions within rigid categories such as "partial closing," "relocation," or "consolidation." As the Board has pointed out, management decisions involve different dimensions, which may be categorized in several ways, and determining whether bargaining is required is not a matter of finding a proper "label" for the decision. Our conclusion that Arrow's closing decision was not a mandatory subject of bargaining is not dependent on a "partial closing" label. We reject the Board's conclusions not as a matter of categorization, but because Arrow's actions, however they might be labelled, were not a subject of mandatory bargaining when examined in light of the analysis set forth by the Supreme Court.
 
 
 29
 We are mindful of the deference to which the Board's decisions are entitled. Deference, however, is not to be equated with "judicial inertia." NLRB v. Financial Institution Employees, 475 U.S. 192, 202, 106 S.Ct. 1007, 1013-14, 89 L.Ed.2d 151 (1986). The Supreme Court remains the final arbiter of the meaning of the National Labor Relations Act, and its decisions are binding on the Board no less than on the lower courts. Arrow's decision to close the Hudson facility was an exercise of entrepreneurial direction and control which was not subject to the duty of mandatory bargaining. It fits squarely within the Supreme Court's holding that "the harm likely to be done to an employer's need to operate freely in deciding to shut down part of its business purely for economic reasons outweighs the incremental benefit that might be gained through the union's participation in making the decision." 452 U.S. at 686, 101 S.Ct. at 2584.
 
 IV.
 
 30
 First National Maintenance teaches that, contrary to the Board's holding, decisions of the magnitude involved here remain management prerogatives, not subject to a statutory bargaining obligation. Whether on the basis of the rule set forth in First National Maintenance, or the balancing analysis the Court followed in establishing it, the result in this case is the same: Arrow was not obligated to bargain. This point is readily illustrated by an application of the balancing analysis to the facts presented here. In applying the First National Maintenance analysis, we first address considerations relevant to the benefit for the collective bargaining process, then turn to those relating to the burden on the employer's ability to conduct its business.
 
 A.
 
 31
 The factor most relevant to labor-management relations is the amenability of Arrow's decision to resolution through collective bargaining. As the Board found, labor costs did play a part in the decision to close Hudson. Another factor, however, was the decline of the market that Hudson served. Sales from Hudson declined over forty percent in the period prior to the closing. There is no reason to believe that bargaining could have had any effect on this aspect of Arrow's decision.
 
 
 32
 Current labor practice, another factor considered by the Court, First National Maintenance, 452 U.S. at 684, 101 S.Ct. at 2583-84; Fibreboard, 379 U.S. at 211, 85 S.Ct. at 403, also supports the view that the decision here was not peculiarly suited to resolution through collective bargaining process. This would be true even if we were to assume that Arrow's decision was purely a "relocation." Provisions imposing restrictions on the decision to relocate have been described as included only in "some contracts, mainly in the apparel industry." See Collective Bargaining Negotiations and Contracts Sec. 65:201-202 (BNA 1987). Further, as the Supreme Court pointed out in First National Maintenance, provisions requiring bargaining over a decision to close are relatively rare. 452 U.S. at 684, 101 S.Ct. at 2583-84. Far more common are provisions requiring notice of a closing and prompt bargaining over effects. See Collective Bargaining Negotiations, supra, at Sec. 65:201-233. Current labor practice thus "supports the apparent imbalance weighing against mandatory bargaining" on these facts. 452 U.S. at 684, 101 S.Ct. at 2583.
 
 
 33
 The length of the bargaining relationship is relevant to the likelihood that bargaining will result in a useful exchange of information and proposals between the union and the employer, thus promoting the labor peace that is the goal of the NLRA. It is true that, unlike the situation in First National Maintenance, the union and Arrow had a lengthy bargaining relationship prior to the closure of Hudson, and that contract negotiations were taking place prior to the decision to close. See id. at 688, 101 S.Ct. at 2585-86. Neither of these facts, however, supports the conclusion that Arrow's decision here is outside the scope of First National Maintenance.
 
 
 34
 Here, two factors emphasized in First National Maintenance indicate that "it is unlikely that requiring bargaining over the decision itself, as well as its effects, will augment this flow of information and suggestions." Id. at 681, 101 S.Ct. at 2582. First, the parties agree that full effects bargaining took place. Through effects bargaining, labor peace is promoted by ensuring that the union "has some control over the effects of the decision and indirectly may ensure that the decision itself is deliberately considered." Id. at 682, 101 S.Ct. at 2582. Second, Arrow's relationship with the union does not involve a "refusal to bargain at all" or a history of other unfair labor practices. Id. at 683, 101 S.Ct. at 2583. The Court has indicated that where, as here, the employer has "performed all its bargaining obligations apart from [decision bargaining]," the union's legitimate interests are likely to be met through those channels. Id. at 684, 101 S.Ct. at 2583-84.
 
 
 35
 We are also persuaded that the contract bargaining prior to the decision to close the Hudson plant had little relevance to the decision-bargaining question. It is true that the decision to close came about only after Arrow and the union failed to agree on a new contract and a strike was in effect at the plant. Yet the parties have stipulated that the closing decision was the product of "economic considerations," and there has been no finding of any anti-union animus on the part of management. See Darlington, 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965). The Board here also found that contract negotiations were at impasse prior to Arrow's decision to consider shutting the plant. See 284 NLRB No. 57, slip op. at 9 (1987). We are not faced here with the "abrogation of ongoing negotiations" over the contract. 452 U.S. at 688, 101 S.Ct. at 2585-86. The Board appears to view the contract and closure negotiations that took place as one incompleted course. Yet Arrow's obligations to bargain about the contract were satisfied, and its proposals withdrawn, before the question of closure arose. Arrow's obligation to bargain about the closing must therefore be considered independently of the contract negotiations on these facts.
 
 
 36
 This case also does not involve an attempt on the part of an employer to subcontract part of the work of an ongoing operation. This alone distinguishes Arrow's case from Fibreboard, where the Court held that an employer's decision to replace its own maintenance workers within a plant with outside workers from a subcontractor was a mandatory subject of bargaining. In such a situation, the possibility for labor strife is great, as employees see fellow workers fired and workers of a nonunion subcontractor enter the plant. Similarly, where some of the workers of a facility that continues to operate are laid off without negotiation, labor relations between the employer and the remaining employees may suffer. Cf. NLRB v. 1199, National Union of Hospital and Health Care Employees, 824 F.2d 318, 321-22 (4th Cir.1987) (layoff of 6 of 85 employees not within the rule of First National Maintenance ). The situation here is far different from that presented in Fibreboard or Health Care Employees in that it does not concern employer actions that "merely replaced existing employees" with cheaper labor that would "do the same work under similar conditions or employment." Fibreboard, 379 U.S. at 203, 85 S.Ct. at 398.
 
 B.
 
 37
 As to the burden on the conduct of Arrow's business, it is apparent that the same burdens that mitigated against mandatory bargaining in First National Maintenance are present here.
 
 
 38
 The magnitude of the decision to shut down an entire facility and to reallocate large amounts of capital underscores the need for certainty in the conduct of business affairs, see 452 U.S. at 679, 101 S.Ct. at 2581. The Board's approach to this case would leave management at sea as to whether it had an obligation to bargain, as an employer could never be certain when a decision might eventually be found by the Board to be too closely related to labor costs. Further, the dispute in this case illustrates that determining how much bargaining is required to satisfy an 8(a)(5) obligation is no less difficult. The Administrative Law Judge found that Arrow had satisfied its obligation to bargain, only to be reversed years later by the Board. This case provides a striking example of the risk created by mandatory decision bargaining that an employer "might be faced ultimately with harsh remedies forcing it to pay large amounts of backpay to employees who likely would have been discharged regardless of bargaining, or even to consider reopening a failing operation." Id. at 684-85, 101 S.Ct. at 2583-84.
 
 
 39
 The possibility that speed, flexibility, and competitiveness important to management may be sacrificed is also quite high in the type of situation presented here. See id. at 682-83, 101 S.Ct. at 2582-83. Where a manufacturing facility is to be shut down, management may need to act swiftly in winding down the operation and reallocating or selling property and equipment. Here, for example, Arrow was able to cancel orders for new equipment at its Santa Maria plant and transfer Hudson equipment there. An obligation to bargain to impasse over a closing decision of this type would make such actions immeasurably more difficult.
 
 
 40
 Finally, the possibility that a mandatory bargaining obligation would give the union a powerful tool for delay is very real in the situation presented here. As the Court has stated, the "union's practical purpose in participating ... will be largely uniform: it will seek to delay or halt the closing." Id. at 681, 101 S.Ct. at 2582. The costs attending such delay here are great. This feature again distinguishes this case from Fibreboard, where the employer merely desired to bring in new workers to perform maintenance work at its plant that had to continue in any event. See 379 U.S. at 213, 85 S.Ct. at 404. Indeed, unlike the situation in First National Maintenance, delay here would require the continued operation of an unprofitable plant, with all the attendant maintenance and overhead costs.
 
 V.
 
 41
 Companies must be able to make closing and consolidation decisions of the magnitude presented here. First National Maintenance recognized that this requires that management be free to act with certainty, and without the constraints imposed by mandatory bargaining. "Congress had no expectation that the elected union representative would become an equal partner in the running of the business in which the union's members are employed." 452 U.S. at 676, 101 S.Ct. at 2579. A fair reading of the Supreme Court's opinion includes Arrow's actions in the class of decisions that "lie at the core of entrepreneurial control." Fibreboard, 379 U.S. at 223, 85 S.Ct. at 409 (Stewart, J., concurring).
 
 
 42
 We recognize that closing decisions such as the one at Hudson can have a significant impact on the lives of men and women whose jobs are at stake. "It is possible that in meeting these problems Congress may eventually decide to give organized labor or government a far heavier hand in controlling what until now have been considered the prerogatives of private business management." Id at 225-26, 85 S.Ct. at 410-11. Such a system would be far different from that of the present statute, however. As it has been construed by the Supreme Court, the National Labor Relations Act does not impose a duty to bargain over the decision here.
 
 
 43
 ENFORCEMENT DENIED.
 
 HARRISON L. WINTER, Chief Judge, dissenting:
 
 44
 I agree with the majority that First National Maintenance Corp. v. NLRB, 452 U.S. 666, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981), is the controlling authority which governs our decision of this case. Regrettably, however, we read First National to apply differently. I read the Supreme Court's interpretation in First National of an employer's duties to bargain to impasse under Section 8 of the National Labor Relations Act (NLRA), 61 Stat. 141, as amended, 29 U.S.C. Sec. 158, to mandate enforcement of the Board's order here. The NLRB's finding that Arrow closed its Hudson, Massachusetts, facility due to labor costs, deciding to relocate just days after striking Union workers voted to reject Arrow's contract offer, is supported by substantial evidence in the record and therefore should not be disturbed. It follows that, under First National, Arrow was required to bargain to impasse before relocating work from its unionized, strike-besieged Hudson plant to its non-union Spartanburg, South Carolina plant.
 
 
 45
 I respectfully dissent from the majority's denial of the Board's cross-petition for enforcement of its order and its grant of the petition to set the Board's order aside.
 
 I.
 
 46
 Union workers at the Hudson plant went on strike on December 1, 1980. The parties held fruitless bargaining sessions, and on March 2, 1981, Hudson employees voted to reject Arrow's contract offer. An Arrow negotiator then sent the Union a telegram withdrawing all contract proposals and requesting a meeting, noting that it "now has under consideration a decision whether or not to continue operations at its Hudson, MA facility." Union and management representatives met on March 23, 1981, and the Board, i.e., the NLRB panel,[1] found that at that meeting, the Union presented a proposal which contained substantial concessions and did not suggest that the proposal was a final offer. Management counsel and spokesman Scott P. Watson did not reject the proposal. The Board found that he simply asked twice if the proposal was the only response to Arrow's telegram, and upon the Union's affirmative response, he stated that he would contact the Union "in a couple of days." The Board further found that "Watson did not comment about the adequacy of the Union's proposals, nor did he indicate at any time during this meeting what cost concessions might be needed to avoid closing the Hudson plant." 284 NLRB No. 57, slip op. at 4 (1987).
 
 
 47
 On March 25, the Arrow board of directors met and decided to close the Hudson plant and relocate the work permanently at its Spartanburg plant. Arrow did not grant the Union's immediate request for bargaining over the decision to relocate. The Administrative Law Judge found that "[t]he sole supervening event [between Arrow's active participation in negotiations and its decision to close the plant] was employee rejection of the last [contract] offer," A. Vol. 1, 30, and the Board agreed that, under the circumstances, the recent history of the management-labor dispute caused Arrow to close the Hudson plant. It found that the closing of the Hudson plant and relocation to Spartanburg "turned upon labor costs and did not involve the scope, direction, or nature of the Respondent's business." 284 NLRB No. 57, slip op. at 8.
 
 
 48
 The Board found, consistent with the parties' stipulations, that the predominant and critical cause of Arrow's decision was production costs, including escalating labor costs.[2] The Board first found the decision to close the plant was based ondeclining sales and escalating production costs. Production costs referred mainly to labor costs, especially the cost of health insurance, which was more expensive at the Hudson plant than at the Spartanburg plant.
 
 
 49
 284 NLRB No. 57, slip op. at 5. The Board further found: "Although the northeast market was declining, the major reason for the Hudson plant's losses was escalating labor costs," id. at 6 (emphasis added). This comports with the stipulations and the Board's ultimate finding that the decision to close the Hudson facility turned upon labor costs and not the "scope, direction, or nature" of Arrow's business, see id. at 8.
 
 
 50
 The majority expresses uncertainty over whether Arrow's decision was motivated in whole or in part by a desire to transfer equipment to a new plant Arrow was opening in Santa Maria, California. Supra at 224. I find no basis in the record to depart from the Board's detailed finding that the Santa Maria situation did not affect Arrow's decision. The minutes of Arrow's March 25 board meeting unequivocally state: "the California situation is not relevant to the decision regarding Hudson," A. Vol. III, 7, and, as the Board found, the Arrow board of directors made no final decision on where to transfer the Hudson equipment at the March 25 meeting. See 284 NLRB No. 57, slip op. at 5. The Board's finding that the decision was not based upon the Santa Maria situation is thus supported by substantial evidence and entitled to deference. I therefore would accept the following Board finding:
 
 
 51
 we reject the contention of a linkage between the Hudson shutdown and the opening of the Santa Maria plant. The record does not support this assertion. The Respondent had made a commitment to open the Santa Maria facility long before it had decided to close the Hudson plant, and there is no evidence to indicate that the continuation of the Santa Maria project was in any way contingent on a decision to close the Hudson plant. The Santa Maria plant merely replaced the Respondent's Vernon, California facility. In fact, the minutes of the 25 March board of directors' meeting reflect a concern only that the Hudson plant closing not have an adverse effect on the startup costs of the new plant.
 
 
 52
 284 NLRB No. 57, slip op. at 7. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (Board's findings must be accepted as conclusive on judicial review if supported by substantial evidence on the record as a whole).
 
 
 53
 Similarly, the majority notes that the Hudson plant had been losing money for some time. The Board found that the plant had been losing money since 1977, and was losing more money in 1981 because of the strike. 284 NLRB No. 57, slip op. at 6. The Board acknowledged this fact and weighed it along with four other circumstances surrounding the Hudson relocation, id. at 6-7, including the fact that the issue of closing and transfer was raised by Arrow
 
 
 54
 in direct response to the Union's rejection of its contract proposal on March 2. Under these circumstances, we find that the Respondent's decision to close the Hudson plant and to transfer work permanently to the Spartanburg facility was a direct consequence of this frustration with the lack of progress in resolving economic issues, particularly health insurance costs, in contract negotiations with the Union.
 
 
 55
 284 NLRB No. 57, slip op. at 7.
 
 
 56
 While the majority states: "Beginning in 1978, Arrow management considered closing the Hudson plant in order to increase Arrow's profitability," supra at 224, the record provides a basis for insight into why Arrow's annual losses had not, prior to the strike, been the occasion for serious discussion concerning closing the plant. An Arrow employee, Executive Vice President Ledbetter, had mentioned the possibility of closing Hudson quite informally, but testified in proceedings before the ALJ that he never formally discussed the possibility with the Arrow President Holtzwasser until after March 2, 1981, the day Union employees rejected Arrow's contract offer:
 
 
 57
 Q: Prior to March of '81, you and Mr. Holtzlosher [Holtzwasser] had discussed the possibility of closing the Hudson plant. Isn't that correct?
 
 
 58
 A: We discussed the consideration for closing.
 
 
 59
 Q: And, when would you say you started those discussions? When would you say that they began?
 
 
 60
 A: After March 2nd.
 
 
 61
 Q: March 2, 1981?
 
 
 62
 A: Yes.
 
 
 63
 Q: And, not before. Never had you discussed that topic?
 
 
 64
 A: No formal discussions.
 
 
 65
 Q: Well, did you discuss it with Mr. Holtzlosher at all, formally or informally?
 
 
 66
 A: Maybe it did come up in an offhand remark of some sort, but no discussion.
 
 
 67
 JUDGE HARMATZ: That is March 2, 1981.
 
 
 68
 A: Right. Yes sir.
 
 
 69
 Q: But, I'm talking prior to March 2, 1981, did you and Mr. Holtzlosher ever discuss the possibility of closing the Hudson plant?
 
 
 70
 A: I don't recall, other than what I've just answered.
 
 
 71
 Q: Let me see if I can refresh your recollection.
 
 
 72
 A. Vol. II, 58-59. The questioning later continued as follows:
 
 
 73
 Q: And, does that refresh your recollection as to when you first began discussing the possibility of closing Hudson with Mr. Holtzwasser?
 
 
 74
 A: My answer was from time to time.
 
 
 75
 Q: Okay. Going back to how far was my question.
 
 
 76
 A: The question was '79, and I said, "Possibly." The question was '80, and I said, "Possibly."
 
 
 77
 Q: So, what you are saying that these discussions with Mr. Holtzwasser possibly, about closing the Hudson plant, possibly would have started back in 1979?
 
 
 78
 A: There were still no formal discussions at any time.
 
 
 79
 Q: You were a member of the Board of Directors?
 
 
 80
 A: That's right.
 
 
 81
 Q: And he was a member of the Board of Directors, right?
 
 
 82
 A: Yes.
 
 
 83
 Q: And, you were Executive Vice President and he was the President, right?
 
 
 84
 A: Yes.
 
 
 85
 Q: And, you discussed, right?
 
 
 86
 A: Still no formal discussion.
 
 Id. at 59-60.[3]
 
 87
 There was thus substantial evidence to support the Board's finding that Arrow's decision to relocate turned specifically on labor costs, see Universal Camera, supra, and it strains credulity to suggest that Arrow's decision, coming as it did after active participation in contract negotiations up until the March 2 vote, turned on other considerations.[4]
 
 
 88
 The Board found that Arrow failed to bargain to impasse after the Union offered substantial concessions at the March 23 meeting, and instead, two days later, decided to relocate. The majority states that it is "persuaded that the contract bargaining prior to the decision to close the Hudson plant had little relevance to the decision-bargaining question," and that "Arrow's obligations to bargain about the contract were satisfied, and its proposals withdrawn, before the question of closure arose." Supra at 231. The majority suggests:
 
 
 89
 The Board here also found that contract negotiations were at impasse prior to Arrow's decision to consider shutting the plant. See 284 NLRB No. 57, slip op. at 9 (1987). We are not faced here with the "abrogation of ongoing negotiations" over the contract. [First National,] 452 U.S. at 688 [101 S.Ct. at 2585-86].
 
 
 90
 Id.
 
 
 91
 To my mind, the Board's decision may not be thus characterized. While the Board found that negotiations may have been at an impasse prior to March 23, it also found that the Union's substantial concession in the March 23 meeting revived contract negotiations. At the time Arrow decided to close the plant, the Board did indeed find an abrogation of ongoing contract negotiations:
 
 
 92
 we find that the parties had not yet reached impasse. Although bargaining was apparently [at] an impasse prior to 9 March, the Respondent's interjection of the possibility of closing of the Hudson plant produced substantial bargaining concessions by the Union. The Respondent demonstrated a lack of complete candor in subsequent discussion. Only one negotiating session was held concerning the possibility of closing the Hudson plant. This possibility, with resultant job loss, was of paramount importance to employees and warranted a sufficient opportunity to discuss the various options available and the economic considerations involved. No such discussion occurred. In response to the Respondent's statement that it was considering closing the Hudson plant, the Union on 23 March substantially modified its proposal to the Respondent on wages, benefits, and health insurance.... In sum, just as the Union had made substantial concessions in an attempt to meet the Respondent's concerns about labor costs and to break the bargaining deadlock which had provoked the Respondent to consider closing the Hudson plant, the Respondent peremptorily foreclosed further negotiations prior to impasse.
 
 
 93
 See 284 NLRB No. 57, slip op. at 9-10. Had the Board found that Arrow and the Union were at an impasse when Arrow decided to relocate work from its strike-besieged, unionized Massachusetts plant to the South Carolina plant, Arrow would have met its obligations under Section 8 of the NLRA, and we would have no case. But the Board found otherwise, and I think that its finding is amply supported by the record.
 
 
 94
 Overall, I am persuaded that the NLRB's findings are supported by substantial evidence, and I thus accept them as the base for a review of the Board's legal conclusions. Specifically I accept as binding the findings that Arrow's decision to close its strike-besieged Hudson plant and permanently transfer work to its Spartanburg plant was made because of labor costs, "did not involve the scope, direction, or nature" of its business, see 284 NLRB No. 57, slip op. at 8, and was made two days after a substantial concession by the Union without first bargaining to impasse with the Union.
 
 II.
 
 95
 A fundamental aim of the NLRA is to establish and maintain industrial peace, and the promotion of collective bargaining is central to this purpose "as a method of defusing and channeling conflict between labor and management." First National, 452 U.S. at 674, 101 S.Ct. at 2578 (footnote omitted). Under Section 8(a) of the NLRA,
 
 
 96
 (a) It shall be an unfair labor practice for an employer--
 
 
 97
 * * *
 
 
 98
 * * *(5) to refuse to bargain collectively with the representatives of his employees....
 
 
 99
 29 U.S.C. Sec. 158(a) (1982). Section 8 further provides:
 
 
 100
 (d) For purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder....
 
 
 101
 Section 8(d) of the NLRA, 29 U.S.C. Sec. 158(d). Bargaining must be to impasse. See NLRB v. Katz, 369 U.S. 736, 741-43 & n. 7, 82 S.Ct. 1107, 1110 & n. 7, 8 L.Ed.2d 230 (1962).
 
 
 102
 Upon review of a Board order, we are to afford appropriate deference to the Board's expertise in "applying the general provisions of the Act to the complexities of industrial life." NLRB v. Erie Resistor Corp., 373 U.S. 221, 236, 83 S.Ct. 1139, 1150, 10 L.Ed.2d 308 (1963). If the Board's resolution of conflicting claims represents a defensible construction of the statute, it is entitled to considerable deference, for "[t]he function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." NLRB v. Local 103, International Association of Iron Workers, 434 U.S. 335, 350, 98 S.Ct. 651, 660, 54 L.Ed.2d 586 (1978) (quoting NLRB v. Truck Drivers Local 449, 353 U.S. 87, 96, 77 S.Ct. 643, 647-48, 1 L.Ed.2d 676 (1957)).
 
 
 103
 In First National, the Supreme Court interpreted the scope of this mandatory duty to bargain. First National Maintenance CorporationM was engaged in the business of providing housekeeping and related services for commercial customers. FNM determined that its contract with a nursing home, Greenpark Care Center (Greenpark), was unprofitable. While FNM workers lost their jobs as a result of FNM's decision to terminate its contract with Greenpark, the decision
 
 
 104
 had as its focus only the economic profitability of the contract with Greenpark, a concern under these facts wholly apart from the employment relationship. This decision, involving a change in the scope and direction of the enterprise, is akin to the decision whether to be in business at all....
 
 
 105
 452 U.S. at 677, 101 S.Ct. at 2580.
 
 
 106
 As the majority correctly recites, the Court divided management decisions into three groups--those, such as choice of advertising, product type, etc., where bargaining is not required; those, such as order of layoffs and recalls, production quotas, etc., where bargaining is mandatory; and those, like the decision in First National which have a direct impact on employment but involve a change in the scope and direction of the enterprise. As to the third category, the Court established a balancing test for determining whether bargaining was mandatory under Section 8:
 
 
 107
 [B]argaining over management decisions that have a substantial impact on the continued availability of employment should be required only if the benefit, for labor-management relations and the collective bargaining process, outweighs the burden placed on the conduct of business.
 
 
 108
 452 U.S. at 679, 101 S.Ct. at 2581. See NLRB v. Island Typographers, Inc., 705 F.2d 44, 50 n. 8 (2 Cir.1983) (plant's decision to update technology fits within this third category of decisions, and is therefore ordinarily subject to the balancing test); Local 2179, United Steelworkers of America v. NLRB, 822 F.2d 559, 571 & n. 17 (5 Cir.1987) (exempted from balancing are decisions which are either clearly exempt or clearly subject to mandatory bargaining). The Court noted that on the facts before it, FNM's decision was purely a management decision based on the size of the fee Greenpark paid it and was therefore not amenable to resolution through the bargaining process. The Court provided guidance for applying its balancing test by reemphasizing such facts at the close of its opinion:In order to illustrate the limits of our holding, we turn again to the specific facts of this case. First, we note that when petitioner decided to terminate its Greenpark contract, it had no intention to replace the discharged employees or to move that operation elsewhere. Petitioner's sole purpose was to reduce its economic loss, and the union made no claim of antiunion animus. In addition, petitioner's dispute with Greenpark was solely over the size of the management fee Greenpark was willing to pay. The union had no control or authority over that fee. The most the union could have offered would have been advice and concessions that Greenpark, the third party upon whom rested the success or failure of the contract, had no duty even to consider. These facts in particular distinguish this case from the subcontracting issue presented in Fibreboard. Further, the union was not selected as the bargaining representative or certified until well after petitioner's economic difficulties at Greenpark had begun. We thus are not faced with an employer's abrogation of ongoing negotiations or an existing bargaining agreement. Finally, while petitioner's business enterprise did not involve the investment of large amounts of capital in single locations, we do not believe that the absence of "significant investment or withdrawal of capital," General Motors Corp., GMC Truck & Coach Div., 191 N.L.R.B., at 952, is crucial. The decision to halt work at this specific location represented a significant change in petitioner's operations, a change not unlike opening a new line of business or going out of business entirely.
 
 
 109
 Id. at 687-88, 101 S.Ct. at 2585.
 
 
 110
 It is my view that Arrow's decision falls into the category of management decisions to which the balancing test should be applied, and that, when applied, we should conclude that its decision was subject to mandatory bargaining. The instant case is distinguishable on each of the grounds the Supreme Court articulated as a reason for not requiring mandatory bargaining. Thus, for precisely the same reasons that FNM's decision was not amenable to resolution through bargaining, Arrow's decision to relocate was subject to Section 8's mandatory bargaining provisions.
 
 
 111
 First, Arrow did intend to move work to Spartanburg, and thus this was a relocation and not a partial closing.[5] Second, the Board found that Arrow was motivated by the employees' rejection of its latest contract offer. Third, escalating production costs, particularly health insurance costs, was an area over which the Union had control. Fourth, Arrow was under a duty to consider concessions offered by the Union. Fifth, the Union was the bargaining representative and Arrow did terminate ongoing collective bargaining in the middle of a strike; and, as the Board found, Arrow's relocation was not akin to opening a new line of business or going out of business entirely.[6] As the Supreme Court reasoned:
 
 
 112
 Under Sec. 8(a)(3) the Board may inquire into the motivations behind a partial closing. An employer may not simply shut down part of its business and mask its desire to weaken and circumvent the union by labeling its decision "purely economic."
 
 452 U.S. at 682, 101 S.Ct. at 2582.[7]
 
 113
 In Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), the Supreme Court concluded that the contracting out of work to an entire unit was a subject of mandatory bargaining. The Court reasoned:
 
 
 114
 [The employer] was induced to contract out the work by assurances from independent contractors that economies could be derived by reducing the work force, decreasing fringe benefits, and eliminating overtime payments. These have long been regarded as matters peculiarly suitable for resolution within the collective bargaining framework, and industrial experience demonstrates that collective negotiation has been highly successful in achieving peaceful accommodation of the conflicting interests. Yet, it is contended that when an employer can effect cost savings in these respects by contracting the work out, there is no need to attempt to achieve similar economies through negotiation with existing employees or to provide them with an opportunity to negotiate a mutually acceptable alternative. The short answer is that, although it is not possible to say whether a satisfactory solution could be reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to collective bargaining.
 
 
 115
 379 U.S. at 213-14, 85 S.Ct. at 404.[8] The Supreme Court in First National stated that the Fibreboard Court implicitly engaged in this balancing analysis, 452 U.S. at 679, 101 S.Ct. at 2581. The reasoning in Fibreboard is applicable here. Arrow was not required to submit to the Union's wish that it not relocate. But it was required to bargain to impasse and thus give the Union a fair opportunity to present sufficient concessions to change its mind and avoid the termination of Hudson employees' jobs. See NLRB v. Westinghouse Broadcasting and Cable, Inc., 849 F.2d 15 (1 Cir.1988) (company's unilateral decision to eliminate unit of news couriers and to subcontract their work was a mandatory subject of bargaining; by bargaining, Union could have affected the decision to eliminate the unit).
 
 
 116
 In NLRB v. Local 1199, National Union of Hospital and Health Care Employees, 824 F.2d 318 (4 Cir.1987), we applied the reasoning of First National in enforcing a Board order requiring mandatory bargaining of an employer's decision to lay off six of its eighty-five employees. We said that because the employer's decision
 
 
 117
 reflected more "a desire to reduce labor costs," First National Maintenance, 452 U.S. at 680, 101 S.Ct. at 2581, than an exercise of entrepreneurial prerogative or control, we agree with the Board that it was amenable to resolution through the collective bargaining process.
 
 
 118
 Id. at 322.
 
 
 119
 The majority cites other Court of Appeals decisions for the proposition that "economically motivated partial closing decisions are not subjects of bargaining." Supra at 227. As I read the cases cited by the majority, none suggests that "economic motivation" is a critical factor; almost everything an employer does will be economically motivated. Thus, I do not think that they support denial of enforcement of the Board's order. In International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. NLRB, 765 F.2d 175 (D.C.Cir.1985), at 181 n. 23, the District of Columbia Circuit said, in the course of concluding that an employer acted consistently with the collective bargaining contract and thus did not modify an agreement in violation of Section 8(d):
 
 
 120
 The Board never reached the issue [of] whether relocation is a mandatory subject of bargaining. Neither must we decide that issue. Even assuming arguendo, as we do here, that it is a mandatory subject, we find no violation of the duty to bargain or of section 8(d) [citing, inter alia, First National ].
 
 
 121
 In NLRB v. Island Typographers, Inc., 705 F.2d 44 (2 Cir.1983), at 50 n. 8, the Second Circuit concluded that a decision to update a plant's technology was within the class of decisions subject to the First National balancing test, but that there was no need to apply the test in light of its conclusion that the union had waived its right to bargain over the decision. In Vitek Electronics, Inc. v. NLRB, 763 F.2d 561 (3 Cir.1985), at 565 n. 5, the Third Circuit did not discuss relocations but merely cited First National for the proposition: "The Supreme Court has since held that an employer need not bargain over the decision to close a plant" [emphasis in original].
 
 
 122
 Similarly, the other Court of Appeals decisions cited by the majority contain unobjectionable propositions which do not support the result it reaches. See Serrano v. Jones & Laughlin Steel Co., 790 F.2d 1279, 1286-87 (6 Cir.1986) (citing First National for the conclusion that the employer could decide to close the plant but had a duty to bargain in good faith over the effects of the decision); Mason v. Continental Group, Inc., 763 F.2d 1219, 1224 (11 Cir.1985) ("First National Maintenance holds that the employer's decision to close down a plant is not one of the 'terms and conditions of employment' under section 8(d)"), cert. denied, 474 U.S. 1087, 106 S.Ct. 863, 88 L.Ed.2d 902 (1986).
 
 
 123
 In Local 2179, United Steelworkers of America v. NLRB, 822 F.2d 559 (5 Cir.1987), the Fifth Circuit simply stated at the cited location that in First National, "the Supreme Court ruled that a particular management decision of this type--a partial business closing for purely economic reasons--was not subject to mandatory bargaining." Id. at 567. In fact, the Fifth Circuit's decision in Local 2179 contains an excellent and thorough discussion of the various Supreme Court and NLRB precedents defining the scope of mandatory bargaining, see generally id. at 569-76. After extensive consideration, the Fifth Circuit expressly rejected an argument that First National creates a per se rule in favor of mandatory bargaining on relocations, id. at 576, while also noting that "it is by no means entirely clear that First National Maintenance adopted a per se rule for all partial closings," id. The Fifth Circuit reasoned that the Supreme Court wished to adopt a more fact-specific methodology in disclaiming "dictation of any particular results" beyond the precise question before it: "economically motivated partial closings, or at least those not turning on labor costs...." Id. at 577.
 
 
 124
 As applied to the facts of this case, I believe First National and Fibreboard, as well as our decision in Local 1199, clearly support the NLRB's decision.[9] When a relocation is effected because of labor costs, the relocation must be preceded by genuine bona fide bargaining pursuant to the NLRA to bring labor costs to a level acceptable to management.
 
 III.
 
 125
 Because I agree with the Board that Arrow's conduct constituted an unfair labor practice under Section 8 of the NLRA, I must reach Arrow's second challenge to the Board's order.
 
 
 126
 The Board did not order that Arrow accept the Union's concessions, but only that it bargain to impasse, requiring Arrow to respond to Union proposals and provide the Union the opportunity to make even more substantial concessions. It ordered back pay net of interim wages received by former Hudson plant employees after the facility was closed. Arrow contends that the Board abused its discretion in fashioning this remedy. Arrow argues that the Board's back pay order improperly punishes Arrow for the Board's "own substantial delay of nearly five years" before ruling on the ALJ's findings, and that the Board's order that Arrow bargain over closing the Hudson plant is unrealistic and unduly burdensome, coming as it does so many years after the Hudson facility was closed.
 
 
 127
 The Board has broad discretion in fashioning remedies for unfair labor practices.
 
 
 128
 Section 10(c) of the Act empowers the Board to remedy the effect of unfair labor practices by "such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." 29 U.S.C. Sec. 160(c). The Board has "primary responsibility and broad discretion to devise remedies that effectuate the policies of the Act, subject only to limited judicial review." Sure-Tan, Inc. v. NLRB, 467 U.S. 883, 898-99, 104 S.Ct. 2803, 2812, 81 L.Ed.2d 732 (1984). Courts may not lightly substitute their own judgment on "how best to undo the effects of unfair labor practices." Id. at 899, 104 S.Ct. at 2812.
 
 
 129
 NLRB v. Local 1199, 824 F.2d at 323.
 
 
 130
 The Board's ordered remedy is not unduly burdensome. Arrow is not required to reopen the plant, but only, upon the Union's request within 10 days of the Board's order, to bargain until a bona fide impasse is reached or the Union fails to bargain in good faith. If negotiations reach an impasse fairly quickly, Arrow will not incur substantial additional liability for back pay under the order's terms. In requiring Arrow belatedly to comply with its responsibilities under Section 8 of the NLRA, the Board did not impose an unduly burdensome obligation amounting to an abuse of its broad discretion in fashioning remedies.
 
 
 131
 Although the extensive delay in proceedings is unfortunate, it should not affect the legal outcome of this case. I would enforce the NLRB's order, including its remedial back pay provision, for "the Board is not required to place the consequences of its own delay, even if inordinate, upon wronged employees to the benefit of wrongdoing employers." NLRB v. J.H. Rutter-Rex Manufacturing Co., 396 U.S. 258, 265, 90 S.Ct. 417, 421, 24 L.Ed.2d 405 (1969) (citations omitted).
 
 IV.
 
 132
 In sum, if the majority is correct in stating that the Hudson closing did not turn largely on labor costs, and was simply an exercise of managerial discretion to close a plant based upon long-range considerations not amenable to resolution through collective-bargaining, then it should follow upon application of First National that the NLRB's cross-appeal for enforcement of its order should be denied. But that is not this case. I am unpersuaded by the majority's discussion of why Arrow management closed the Hudson plant. I believe that the Board's findings, particularly its finding that the decision to close Hudson turned on labor costs, and not the scope, nature, and direction of Arrow's business, are clearly supported by substantial evidence on the record as a whole. I would therefore conclude, consistent with the Board's ruling under First National, as well as Fibreboard and our decision in NLRB v. Local 1199, that Arrow committed an unfair labor practice in failing to bargain to impasse concerning a relocation decision which turned on labor costs. Furthermore, I do not believe the NLRB abused its discretion in fashioning a remedy. Accordingly, I would grant the Board's cross-petition for enforcement and deny Arrow's petition to review and set aside the order.
 
 
 
 [1]
 Arrow requested the bargaining on counsel's advice that Arrow was required under the NLRB's rulings as of that time to bargain over the closing decision
 
 
 [2]
 During the effects bargaining, the union filed an unfair labor practice complaint that was later dismissed, and filed a class action seeking injunctive relief on the ground that Arrow closed the plant in order to discriminate against the workers on the basis of age, sex, race, and national origin. Nonetheless, the parties have now stipulated that the effects bargaining was adequate
 
 
 [1]
 The NLRB delegated its authority to review the ALJ's decision to a three-member panel
 
 
 [2]
 At the March 23 meeting, the Union offered concessions, which the Board found to be substantial, concerning health insurance costs. The Union's new proposal also called for a wage increase in accord with the Company's last wage proposal and withdrew a request for additional "personal holidays." It also contained other concessions. The Board found that the Union's proposal left the parties in disagreement, compared with Arrow's latest contract offer, concerning increases in pension benefits; accident and sickness benefits; the elimination of the deductible from a certain health insurance plan, should the plan be selected; and the Company's proposal that employees pay all of an interim increase in health insurance premiums
 The parties' stipulations read in part:
 
 
 [23]
 The decision to close the Hudson plant was based on economic considerations including a decrease in profits at that plant which was the result of a decline in sales volume coupled with escalating production costs
 
 
 [24]
 The escalating production costs referred to in paragraph 23 included labor costs, especially the cost of health insurance. The cost of employee health insurance was less at the Spartanburg and Morrilton plants than it was at the Hudson plant
 A. Vol. III, 3.
 The Board did not make an express finding on whether anti-union animus motivated the relocation decision. It did find that shortly after Arrow's contract offer had been rejected by the workers and "just as the Union had made substantial concessions," Arrow "peremptorily foreclosed further negotiations." 284 NLRB No. 57, slip op. at 10.
 
 
 [3]
 Upon cross-examination, the witness offered the reasons for the reluctance to consider closing, despite repeated annual losses:
 Well, Arrow Automotive Industries started in Massachusetts, by the Holtzwasser family. That's Mr. Harry Holtzwasser's father.
 I was hesitant to go to Mr. Holtzwasser and tell him that we should close up the family business in the location in which it was founded, because there was a certain amount of sentimental--I'm sure--family ties, in having Arrow in Massachusetts. So, you are just reluctant to tell your boss, that he should close up the place.
 Id. at 63-64.
 
 
 [4]
 Even Arrow all but conceded that the decision to close the Hudson facility was based upon labor costs and was a subject potentially amenable to resolution through bargaining when Arrow product director Robert Holtzwasser testified that Arrow management evaluated the Union's March 23 offer as insufficient: "They thought it was far short of what was required to keep the plant operating." A. Vol. II, 275
 
 
 [5]
 The majority states that the label for Arrow's action, be it "partial closing" or "relocation," is not of legal significance. I think otherwise. The fact that Arrow's actions are properly termed a relocation, not a closing, is a basis upon which the Supreme Court expressly limited its holding in First National, suggesting that relocations would raise a more difficult issue. The Supreme Court's observation and limitation of its holding on the basis that FNM had no intention of moving its operation elsewhere echoes the Supreme Court's earlier limitation of its holding to the partial closing context:
 In this opinion we of course intimate no view as to other types of management decisions, such as plant relocations, sales, other kinds of subcontracting, automation, etc., which are to be considered on their particular facts. See, e.g., International Ladies' Garment Workers Union v. NLRB, 150 U.S.App.D.C. 71, 463 F.2d 907 (1972) (plant relocation predominantly due to labor costs)....
 452 U.S. at 686 n. 22, 101 S.Ct. at 2584 n. 22. While I agree with the majority that First National properly governs our approach to this case, there is clear and repeated evidence that the Supreme Court was cognizant that its methodology, when applied to different facts, would yield different results.
 The majority also suggests in the alternative that Arrow's decision amounted to a partial closing, and not a relocation, because the decision decreased the number of plants and altered the geographic focus of Arrow's business. I am not persuaded that a management decision that effects this type of consolidation is not properly termed a relocation. The majority's attempt to limit the term "relocation" to situations where a new plant is opened is contrary to common usage, and it cannot circumvent the underlying reality of labor-management relations: the Hudson workers lost their jobs and the non-union Spartanburg facility undertook to do the work the Hudson workers had theretofore performed.
 
 
 [6]
 The majority emphasizes the magnitude of the relocation decision as a basis to exempt it from mandatory bargaining. There are many decisions management can make which have broad, dramatic repercussions, but which are nonetheless subject to mandatory bargaining. The Supreme Court's reasoning in First National is clearly founded on the kind of decision FNM made, a partial closing involving an area of entrepreneurial control over which the union did not properly have direct input, and was not founded on the impact of FNM's decision
 
 
 [7]
 The Court also stated that unions have "direct protection against a partial closing decision that is motivated by an intent to harm a union." Id
 
 
 [8]
 Justice Stewart, writing in concurrence, articulated an approach which is also fully consistent, I believe, with my position and that of the Supreme Court in First National:
 If, as I think clear, the purpose of Sec. 8(d) is to describe a limited area subject to the duty of collective bargaining, these management decisions which are fundamental to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from that area.
 Id. at 223.
 
 
 [9]
 Thus there is no need to reach the issue of whether the NLRB correctly interpreted First National in Otis Elevator Corp., 269 NLRB 891 (1984) (Otis II ). In Otis II, the Board stated that bargaining was mandatory when a closing "turned on labor costs." The Fifth Circuit has characterized the Board's decision as "a principled attempt to respond to the major themes of First National Maintenance and Fibreboard by a formula which avoids the rigidity of per se across-the-board characterizations...." Local 2179, 822 F.2d at 580